ROCHESTER GAS AND ELECTRIC CORPORATION, Petitioner, v PUB-
LIC SERVICE COMMISSION, Respondent.

Third Department, November 9, 1978

346

### APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (Richard N. George* of counsel), for petitioner.

*Peter H. Schiff (Sigrid J. Hammond* of counsel), for respondent.

### OPINION OF THE COURT

HERLIHY, J.

In this proceeding, Rochester Gas and Electric Corporaton ("Rochester" or "the company") challenges the determinations of the Public Service Commission (PSC), issued on November 1, 1977 and on January 20, 1978.

On December 3, 1976, Rochester filed proposed tariff revisions designed to increase electric revenues by about $20 million and gas revenues by $7 million. Public hearings on the proposed changes were conducted and following those hearings an Administrative Law Judge recommended the respective increases of $15,800,000 and $3,700,000 in electric and gas revenues. The PSC in its initial determination of November 1, 1977 reduced the proposed increases to the sums of $10,186,-588 and $2,535,645 for electric and gas revenues. Further, the initial determination provided as follows: "We shall permit RG&E [Rochester] to file tariff revisions to be effective in February, 1978 to recover actual increased wage and salary expenses that will become effective at that time, but, since the increase is not subject to collective bargaining, in no event

will we allow an amount greater than the 6% increase estimated in this proceeding. We find this amount reasonable and the company can effectively preclude a higher increase from being paid. The company also will be required to provide evidence of labor productivity gains it expects to realize in the period during which the higher wage costs will be effective."

Rochester objected to the initial determination by seeking a rehearing on six issues. Three of the objections raised by Rochester are also the particular issues raised in this proceeding. *One* of these issues was phrased in part by Rochester in its objections as follows: "The Company must take strong exception to the Commission having limited- the allowable 1978 wage increase on the stated basis that 'the increase is not subject to collective bargaining'. This rationale is arbitrary and capricious, without basis in fact or in law. It amounts to imposing a penalty upon both the Company and its employees for the fact that the Company is not unionized, and to an effort to coerce both the Company and its employees into becoming unionized. As such it constitutes an unpermitted interference with both the freedom of the Company's employees and the rights of Company management."

The PSC in its final determination, issued on January 20, 1978, denied a rehearing on any issue, but did revise its initial determination by allowing Rochester to include in its proposed rate filing an additional expense item of $120,000. On the question of wages, the PSC in this determination stated in part: "Our decision to follow this procedure in no way affects the freedom of the company management or its employees with respect to labor relations and was clearly not intended to coerce the company and its employees to become unionized as RG&E contends. To repeat, we simply authorized RG&E to file revised tariffs in February, 1978 to recover its actual higher wage expense anticipated to become effective at that time, up to a level of increase that the company itself estimated in this proceeding."

As to the other issues, the PSC in its initial determination and its subsequent refusal of a rehearing applied its "policy" or guideline as to certain forms of advertising generally described as informational, and accordingly limited the allowable portion of such expense to 0.1% of gross revenues. Further, the PSC disallowed a portion of test year expenses incurred for the hiring of outside contractors.

Rochester in its petition, briefs, and arguments in the

proceeding before this court generally contends that in its ruling on the question of anticipated wage increases, informational advertising expenses and the expense for outside contractors, the PSC has acted arbitrarily and capriciously, irrationally, illegally, and/or dehors the facts established in the record.

■ I. The disallowance of wages in the present record and in particular the refusal to conduct a hearing on the reasonableness of the actual increase exceeding 6% was without any rational basis in the record and is arbitrary and capricious.

The details of the controversy as to wages are set forth hereinabove. The attempt of the commission to distinguish between utilities involved in collective bargaining and those whose employees are not union members has no rational basis as evidence of future wage increases. Furthermore, the classification of the industry as to unions for the purpose of a prophecy of future wage increases would tend to encourage the employees to form or join unions as an inducement for management to grant larger wage increments. The PSC by its intrusion into the internal affairs of the utility in this particular case exceeds its power under the Public Service Law even though it attempted to modify or rectify the obvious reference to collective bargaining in its determination of January 20, 1978.

Furthermore, the record contained evidence that an increase of more than 6% was likely. The company pointed out that its 6% estimate was not truly based upon a forecast of actual wages, rather it was the same inflation rate which it had used in its proposed adjustments to escalate other components of expense to a probable 1978 cost level. As such, the estimate did not provide for merit increases. In this vein, the company's 2,012 weekly employees were eligible for cost of living and merit increases, while the 632 monthly employees, although only entitled to merit increases, were granted raises equivalent to the total over-all increase given weekly employees. Thus, there is evidence to indicate that a wage increase of more than 6% was the only reasonable conclusion.

■ Under such circumstances a refusal to permit a hearing as to the reasonableness of the actual increase, when a rate increase may not take effect until there is such an actual increase in wages, is arbitrary. (See, e.g., *Matter of New York Tel. Co. v Public Serv. Comm.,* 64 AD2d 232.) As pointed out by Rochester: "The law is well-settled that the Commission may

not rely on a reckoning when actual experience is available and establishes that the predictions have been substantially incorrect" *(Matter of New York Tel. Co. v Public Serv. Comm. of State of N. Y.,* 29 NY2d 164, 169).

In regard to the wage increase, it should be noted what, if any, labor productivity gains are to be expected are properly required by the PSC to be considered in ascertaining the amount to be passed on to the consumer. The determination should be modified in accordance with the foregoing consideration of the wage increase.

■ II. In regard to the question of the amount of contractors' expenses to be allowed, it is noted that those expenses connected with the conversion of capital equipment in the gas distribution facilities as such need not be classified as incidental upkeep or operation of the business on an annual basis. There is no substantial foundation for the suggestion that the PSC erred in its treatment of this expenditure to the prejudice of the *petitioner,* and, accordingly, the determination on this issue should be confirmed as within the expertise of the PSC.

III. Rochester alleges several errors and/or illegalities as to the refusal of the PSC to allow more than $295,101 for anticipated information advertising expense. In its brief the company states that the advertising expense at issue is not related to promotional or commercial advertising. At the hearings held on this matter it was established that Rochester had for the test year, expenditures totaling about $780,000 which it allocates as follows: $258,524 for promoting the conservation of electricity and gas; $108,788 for promoting the safe use of its facilities and services; $87,276 for promoting information for individual customers as to obtaining and maintaining services; $71,544 for promoting "community" activities; $67,082 for advertising regarding the rising cost of energy; $180,491 for advertising general information about the company; and, $6,154 for promoting technical information for professionals and "do-it-yourselfers".

■ Rochester urges that recognizing the advertising as informational and not specifically designed to sell goods and services, it is within its right to freedom of speech and, therefore, the refusal to accept every penny so spent as a necessary expense for reimbursement violates the "First Amendment" except as such expenditures exceed the "limits of reason". In the case of *West Ohio Gas Co. v Comm. (No. 1)* (294 US 63, 72) the court observed that: "Within the limits of

reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others." However, the reliance by petitioner upon the *West Ohio* case for its argument in regard to free speech is inappropriate as the court therein, per the Honorable Justice CARDOZO, was not considering costs incurred in the simple dissemination of ideas or communications not designed to sell goods and services.

■ *Assuming* for present purposes that a corporate body or person has the full and complete protection of the constitutional right to freedom of speech unrelated to the immediate cultivation of profit and income in the matter of public service, or freedom of educating the public, as propaganda is often entitled, the present record discloses no interference with that right. It is established that the PSC has not in any way precluded Rochester from spending any moneys it may desire so long as the stockholders do not object, thus, there is no *direct* prohibition or limitation on free speech. As to an indirect limitation, it is certain that the consumers are not concerned with such niceties as the image of a utility. The refusal to permit a direct reimbursement to a utility of expenditures of an informational character is not an indirect limitation because the burden imposed on the consumer in exchange for a monopoly to a utility is the obligation to reimburse the utility for reasonable operating expenses and this court has recently held that not all of promotional advertising must be charged to consumers *(Matter of Consolidated Edison Co. of N. Y. v Public Serv. Comm.,* 63 AD2d 364).

Upon the present record we find no infringement upon the freedom of speech of the company.

The company further contends that the refusal to allow the subject advertising expenses constituted a taking of its property without compensation. In turn, this alleged error requires consideration of whether or not there is evidence in the record to support the determination of the PSC as being upon a reasonable basis and not being arbitrary and capricious (see *Matter of County of Orange v Public Serv. Comm. of State of N. Y.,* 37 NY2d 762, 765; *Matter of Legislature of County of Rockland v New York State Public Serv. Comm.,* 49 AD2d 484, 487).

The record discloses that the PSC in the course of regulating rates concluded that a piecemeal examination of each item of informational advertising expenditure to determine its

eligibility for reimbursement as being "reasonable" or "unreasonable" was too time consuming to be beneficial in its hearing, and, therefore, it adopted studies and promulgated guidelines which would establish that without particular examination, the maximum reasonable amount would be 0.1% of operating revenues.*

An examination of the record reveals that there was testimony on behalf of Rochester which segregated the expenditure for informational advertising according to the categories referred to hereinabove as conservation, *et cetera*. However, there was no direct testimony as to each and every item in the grouping to show that the individual expenditures were "reasonable" or that the entire expenditure was reasonable. The PSC in its determination of January 20, 1978 construed the effect of that testimony as follows: "RG&E [Rochester] also maintains that it satisfied its burden of proof as to the need for an advertising allowance equivalent to the amount it expended for that purpose in the test year. As we observed in our principal Opinion, however, RG&E's testimony on advertising is a litany of how and where it spent $755,982 on advertising in 1976 and concludes that an allowance within the Commission's Policy Statement range would be wholly inadequate. No effort was made to suggest why the test year level of expenditure was necessary and proper."

---

* In its determination of January 20, 1978, the PSC described the situation as follows: *Advertising Expense*

"RG&E next takes issue with our decision to reduce allowable advertising expense form the $750,982 level incurred during the test year to $295,101, an amount which represents one-tenth of 1% of RG&E's operating revenues. The decision implements our policy of setting an allowance for informational and institutional advertising costs in accordance with certain guidelines established in our Advertising Policy Statement issued on February 25, 1977, in lieu of conducting an extensive and detailed review of advertising programs and expenditures in rate cases. We found, as we did several years before with respect to refined computations of working capital allowances,[1] that the time and expense of such studies had become wholly disproportionate to the benefits derived from close, individual examination and evaluation of the advertisements involved. Therefore, we announced our intention to forego individual examination of certain of these advertisements and, instead, to provide utilities in rate cases with a reasonable allowance for informational and institutional advertising, most probably ranging between one-tenth and one-twenty-fifth of 1% of operating revenues, in inverse relationship to the size of the company. We concluded, on the basis of the information available on the company's advertising program and factors such as the company's size, geographical location and number of customers, that RG&E's allowance should be established at the upper limit of the range we indicated to be proper in our policy statement."

---

1. Case 25342, *Consolidated Edison Co. of N. Y.,* 10 NY PSC 434, 450-452 (1970); Case 26088, *Niagara Mohawk Power Corp.,* 11 NY PSC 1475, 1479-1482 (1971).

■ On an over-all view of the record and applying the strictness of review necessarily applicable because the process of rate making is a legislative function, not a judicial one, as the PSC is acting under authority delegated by the Legislature *(Matter of Public Serv. Comm. of State of N. Y. v Norton,* 304 NY 522, 530) it is apparent that the adoption by the PSC of a policy or rule whereby total expenditures in a general category would be "deemed reasonable" within certain objectively ascertainable limits is not arbitrary or capricious. The present record reveals that the PSC has surveyed the gas and electric utilities and by mathematical computation has determined an over-all customary range within the group for the total of the subject expenditures. The accuracy of the range of expenditures as a guideline or test for policy purposes is within the expertise of the PSC and its conclusion that expenditures over such levels require justification is supported by factual evidence gathered by it. Under such circumstances the "policy" or regulation as to informational advertising expenditures is not lacking for a reasonable basis.

Further, the expenses involved in this category are all easily controlled by the management of utilities and are not of such a nature as to relate to the incidental sale of goods and services and thus, such expenditures are inherently discretionary in terms of the over-all property of a utility. Accordingly, the adoption of a guideline whereby the industry itself is on notice that those expenses are expected not to exceed certain levels, as a matter of custom and experience, is reasonable regulation. It should be noted that Rochester had notice that the "policy" was being considered by the PSC for adoption as a guideline during much of the period of time when the subject expenditures were being made.

The "Statement of Policy" as issued by the PSC and applied to this proceeding recites that "parties in rate cases would still be free to question the propriety of the lump allowance for the informational and other institutional advertising categories". The statement of policy recites that in establishing the policy as to advertising, the PSC was considering that it was also its policy to "allow shareholders returns only at the minimum level necessary to attract capital".

The record as a whole demonstrates that in the present case it was not the "reasonableness" of the expenditure for advertising that was truly at issue, but rather the necessity. There

can be no doubt that informational advertising in general has only a limited necessity. Rochester failed to demonstrate upon the present record anything other than the fact that certain expenditures were "allowable". Accordingly, the general presumption that expenditures of a utility are reasonable (cf. *West Ohio Gas Co. v Comm. (No. 1),* 294 US 63, *supra)* was not sufficient to show necessity in view of the survey evidence obtained by the PSC as expressed in the policy.

Upon the present record the petitioner has not established a basis whereby this court can direct the PSC to include more of the informational advertising expenses than it did.

The determinations should be modified to the extent that the determination of November 1, 1977 setting a limit of 6% for future wage increases is annulled and to the extent that the determination of January 20, 1978 refusing a rehearing on the issue of a prospective wage increase is annulled; matter remitted to the Public Service Commission for further proceedings as to the appropriate allowance of a rate increase for the wage increase; and, as so modified, confirmed, without costs.

KANE, J. P., MAIN, LARKIN and MIKOLL, JJ., concur.

Determinations modified to the extent that the determination of November 1, 1977 setting a limit of 6% for future wage increases is annulled and to the extent that the determination of January 20, 1978 refusing a rehearing on the issue of a prospective wage increase is annulled; matter remitted to the Public Service Commission for further proceedings as to the appropriate allowance of a rate increase for the wage increase; and, as so modified, confirmed, without costs.