In the Matter of NEW YORK TELEPHONE COMPANY, Petitioner, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

Third Department, November 2, 1978

## APPEARANCES OF COUNSEL

*George E. Ashley, Raymond Burke* and *Gerald M. Oscar* (*Lawrence E. Walsh, Guy Miller Struve* and *L. Gordon Harriss, Davis Polk & Wardwell* of counsel), for petitioner.

*Peter H. Schiff* (*Charles R. Gibson* of counsel), for respondent.

## OPINION OF THE COURT

MAHONEY, P. J.

On November 17, 1976 petitioner, New York Telephone

Company, filed tariff revisions representing a general rate increase of 12.8% over existing rates designed to produce a gross increase in annual operating revenues of approximately $392.9 million. General rate increases had previously been granted in 1970, 1971, 1972, 1973 and 1975, and petitioner based its claim for another increase on its inability, since 1970, to earn its allowed rate of return. Commencing February 28, 1977 and ending August 9, 1977, hearings were held at which over 80 witnesses testified and numerous exhibits were introduced on behalf of various interested parties. The Administrative Law Judge issued his recommended decision September 9, 1977, concluding that petitioner was entitled to an annual rate increase of $245 million, to be supplemented by allowances for increases in wages, operating taxes and depreciation rates when they became known. He recommended an allowed rate of return of 9.59% on the rate base. On October 13, 1977 the Public Service Commission (Commission) authorized petitioner to put into effect, as temporary rates subject to refund, the rates recommended by the Administrative Law Judge, but the order directed that the tariffs implementing the temporary rates not go into effect until five days after service on all parties and until approved by the Commission. As a result, the temporary rates did not become effective until October 27, 1977. The Commission issued its final decision December 1, 1977, authorizing an annual rate increase of $232.6 million with an allowed rate of return of 9.24% on the rate base. The approved rates included an adjustment for depreciation expenses and for decreased customer demand due to the increased rates, but the Commission did authorize petitioner to file for supplemental allowances to reflect wage and tax increases. After the Commission denied its petition for rehearing, petitioner commenced this proceeding, alleging eight separate grounds for annulling the Commission's determination in whole or in part. Since each of petitioner's contentions raises a substantive issue affecting either the rate, the rate base or refunds by petitioner, an analysis of each is necessary and follows herewith.

### I. PROCEDURE

Initially, petitioner contends that it was denied due process by the manner in which the Commission conducted the hearings and made its decision. Petitioner alleges, and the Commission admits, that the Commission directed its staff to

represent the interests of the consumer by taking an adversary position at the hearings and that, thereafter, the Commission was assisted in its deliberations by senior supervisory staff personnel and opinion writers who had communicated with the trial staff regarding the case.

■ Telephone companies in this State are required to provide adequate service for a just and reasonable charge (Public Service Law, § 91). The Commission has been charged with the duty of enforcing this requirement in general (Public Service Law, § 94) and with the particular task of ensuring that any proposed rate increase be just and reasonable (Public Service Law, § 97, subd 1; *Matter of General Tel. Co. of Upstate N. Y. v Lundy,* 17 NY2d 373, 379). We perceive no inherent conflict between this duty and the Commission's directive that its staff represent the interests of the consumer by taking an adversary position at the hearings. Presumably, the consumers' interests would be best served by just and reasonable rates which are sufficient to ensure adequate service (see *Matter of New York Tel. Co. v Public Serv. Comm. of State of N. Y.,* 59 AD2d 17, 19, mot for lv to app den 42 NY2d 810). While, as here, staff's opinion as to the magnitude of the rate increase necessary to achieve such a result may differ significantly from that of the petitioner, this fact, in and of itself, does not deprive the petitioner of due process.

■ As to the Commission's communications with members of its staff during deliberations, it must be noted that "[t]he process of rate-making is a legislative function, not a judicial one" (*Matter of New York City Housing Auth. v Public Serv. Comm. of State of N. Y.,* 23 AD2d 277, 278, mod 17 NY2d 246; *Staten Is. Edison Corp. v Maltbie,* 270 App Div 55, 58-59, affd 296 NY 374). It is also noteworthy that the provision of the State Administrative Procedure Act which prohibits agency members assigned to make decisions in adjudicatory proceedings from communicating with agency staff engaged in investigating or prosecuting the case specifically excluded proceedings involving public utility rates (State Administrative Procedure Act, § 307, subd 2). "Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances' " (*Withrow v Larkin,* 421 US 35, 55). Accordingly, petitioner's unsupported conjecture must be rejected.

## II. RATE OF RETURN

Petitioner challenges the Commission's determination as to the rate of return on common equity required by petitioner, which rate is an element of the over-all allowed rate of return, contending that the Commission arbitrarily failed to consider all but one of the available approaches to determining the rate of return on equity and that the one approach which the Commission did consider reached an adopted rate of return on equity unsupported by the record. We reject both contentions.

■ ■ The Commission "is not bound to entertain or ignore any particular factor in discharging its primary responsibility to determine rates that are just and reasonable" (*Matter of Tele/Resources v Public Serv. Comm. of State of N. Y.,* 58 AD2d 406, 410). Nor must the Commission's determination be "wholly free from error in the process, or quite in accord with a judicial view of how the procedure before the commission should be managed in detail" (*Matter of City of New York v Public Serv. Comm. of State of N. Y.,* 17 AD2d 581, 584, mot for lv to app den 13 NY2d 594). "The scope of judicial review in these matters is, of course, very limited * * *. The question before us is whether there is a rational basis for the commission's finding that the rates in question are just and reasonable" (*Matter of Consolidated Edison Co. of N. Y. v New York State Public Serv. Comm.,* 53 AD2d 131, 133, mot for lv to app den 40 NY2d 803).

■ Here, interested parties, including petitioner, Commission staff, the Consumer Protection Board and the General Services Administration, presented expert witnesses who gave their opinions as to the rate of return on equity required by petitioner. The various experts employed a total of five different approaches to arrive at their figures, and it is apparent from the Commission's determination that it relied on the so-called discounted cash flow method to determine the allowed rate of return on common equity. We perceive nothing inherently arbitrary and capricious in such reliance as long as the experts were not precluded from presenting other accepted methods of determining rate of return on equity so that the Commission had the opportunity to consider all methods. Implicit in its reliance on the discounted cash flow method is the conclusion that in this particular case that method is the more reliable and since five of the expert witnesses used that method, either exclusively or in addition to other methods, there is support for this conclusion. *Federal Power Comm. v*

*Hope Natural Gas Co.* (320 US 591) does not, as petitioner contends, hold that the comparable earnings test is a mandatory approach. On the contrary, the court stated that "the Commission was not bound to use any single formula or combination of formulae in determining rates * * *. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling" *(id.,* p 602). Similarly, while the Commission's determination must be made with due regard to the value of the property actually used in public service (Public Service Law, § 97, subd 1), "[w]hat consideration is to be given to 'value' 'among other things' is for the commission to decide, having in mind that the overriding principle governing its primary duty is that it shall determine 'just and reasonable rates' " *(Matter of New York Tel. Co. v Public Serv. Comm. of State of N. Y.,* 309 NY 569, 579).

The question presented, therefore, is whether the Commission's determination that the required rate of return on common equity is 11.5% has a rational basis (see *Matter of New York State Council of Retail Merchants v Public Serv. Comm. of State of N. Y.,* 62 AD2d 314, 318; *Matter of Niagara Mohawk Power Corp. v Public Serv. Comm. of State of N. Y.,* 59 AD2d 73, 74). If not, petitioner's right to a fair return as a part of a regulated industry *(Matter of Teleprompter of Mohawk Val. v Pumilio,* 57 AD2d 69, 73) has been denied, which, in turn, results in rates that are not just and reasonable.

The opinions of the experts who used the discounted cash flow method, upon which the Commission relied, ranged from 11.3% to 12.5%. The expert presented by the Consumer Protection Board arrived at a figure of 11.5% and the expert presented by the General Services Administration used 11.5% as the lower end of his range. Petitioner contends that the Commission relied too heavily on the testimony of the staff witness who arrived at a figure of 11.3%, and challenges the manner in which the Commission determined each of the three components of the discounted cash flow method used by the Commission. We note that several of petitioner's challenges cannot be rejected as wholly lacking in merit. In particular, the manner in which the Commission reduced the growth rate component from 5.0%, which it initially arrived at, to 4.3% on the theory that petitioner will have to respond to investor preference for dividends over growth appears to be based largely upon surmise. However, since the result reached

by the Commission, 11.5% as the required rate of return on common equity, falls within the range of expert testimony, it cannot be said that the alleged errors have resulted in a determination unsupported by the record or without rational basis. As noted above, the Commission's determination need not be wholly free from error in process, and in its brief petitioner admits that rate of return "is the most elusive, the most difficult to test against objective standards." Accordingly, in light of the very limited scope of judicial review in these matters, we conclude that the Commission's determination of the rate of return on common equity required by petitioner should not be disturbed.

### III. PROJECTED DATA V. ACTUAL DATA

Since 1972 the Commission, recognizing relentless upward cost spirals caused by ever mounting inflationary pressures, has encouraged the use of a "six and six" test period in all utility rate applications. The petitioner submits actual data for the first six months of the test period and six months of forecast data. During the course of the hearings, actual data can be substituted for the estimates previously submitted.

■ Here, the petitioner presented operating income and rate base data for the 12-month period ending March 31, 1977. This data was composed of six months' actual experience and six months of projections. The hearings began on February 28, 1977. On May 20, 1977 the petitioner completed filing with the Commission staff the actual results to be used in lieu of projected information for the last six months of the test period. The Commission rested its presentation on June 16, 1977. The petitioner presented an exhibit marshalling all the actual data for the 12-month test period as part of its rebuttal which began on June 22, 1977. During rebuttal the petitioner offered testimony as to the effect of the actual data upon the forecast data of the last six months and concluded that the realities of the subject test year showed a marked increase in costs over those generated by the projections, resulting in a large reduction in revenues to the petitioner. The Administrative Law Judge refused to accept the actual data. It was his view that the projected information, having been fully tested in the concluded hearings, was preferable. The Judge observed, however, that the unadjusted actual data produced an 11.7 million dollar revenue requirement over that produced by the projected data. The hearings were concluded on August 9,

1977. The Commission agreed with the Judge and refused to employ the actual data on the grounds (1) it was voluminous and presented too late, (2) the actual data included unexplained variations, and (3) that this case, unlike all prior cases, used forecast or projected data for target dates extending beyond the test period. We disagree.

As noted above, testimony and exhibits in support of the actual data were offered into evidence beginning seven weeks before the close of the hearings and made available to the Commission staff some 11-½ weeks before the hearings were concluded. Given this rather broad time frame within which to analyze the actual data, the Commission's refusal based on untimeliness is meritless, particularly when measured against the Commission's receipt of comparable evidence under similar time restraints in the petitioner's two prior rate proceedings (*New York Tel. Co.,* 13 NY PSC [1973]; *New York Tel. Co.,* 12 NY PSC [1972], affd *sub nom. Matter of City of New York v Public Serv. Comm.,* 42 AD2d 259, app dsmd 33 NY2d 825). Moreover, the record reveals that the Commission in fact used the actual data in a selective manner when it reduced the petitioner's revenue requirements because the actual data revealed the petitioner's medical expense plans were less than had been estimated.

The Commission's second reason for rejection is also meritless. The unexplained variations between the projected and actual data (and we concede such variations may exist in two instances)[1] should more properly serve as a basis for adjusting the revenue requirements of the petitioner rather than as a basis for rejecting the better evidence.

Similarly, the Commission's contention that extensive use of forecast data is required because it was not only attempting to fix a just rate for the test period ending March 31, 1977, but also for an extended period beyond that date, must also be rejected. Review of the petitioner's last two rate proceedings clearly shows that post-test period adjustments were made, and, as the Commission itself noted in *New York Tel. Co.* (15 NY PSC 1719) "Any lesser period would practically assure the almost immediate obsolescence of the rates we set here" (*id.,* p 1723).

---

1. As part of the $11.7 million difference between projected and actual data, $2.7 million was chargeable to a 1970 company income tax deficiency and the actual data gave an unjustified smaller amount ($0.7 million) as a credit to N. Y. Tel. from a $6.3 million Federal income tax reduction.

Thus, it is clear that precedent based on prior Commission practice and case law *(Matter of New York Tel. Co. v Public Serv. Comm. of State of N. Y.,* 29 NY2d 164; *Matter of Chenango & Unadilla Tel. Corp. v Public Serv. Comm. of State of N. Y.,* 45 AD2d 409) compels the conclusion that the Commission erred in rejecting the actual data offered by the petitioner.

### IV. LICENSE CONTRACT PRODUCTIVITY ADJUSTMENT

Pursuant to a license contract with the parent corporation (A T & T), the petitioner receives research data, advice and assistance in all phases of its business operations, including customer services, engineering and network services, employment, legal services and regulatory, accounting, financial and tax matters. In return for such assistance and advice the license contract provides that the petitioner pay A T & T a percentage of gross earnings.[2] The petitioner contends that it was arbitrary for the Commission to reject part of its payment to the parent corporation as an element of its costs. In support of this contention the petitioner proved that any attempt on its part to duplicate the services rendered and the benefits resulting therefrom would have cost the petitioner many millions of dollars more than it paid under the license contract. The Commission, while conceding that the petitioner had presented "[a]n impressive array of evidence in support of its license contract payments", nevertheless disallowed the real increase (net of inflation) in the petitioner's 1976 payments to A T & T over those of 1975. The amount of this disallowance was $6,890,000. It was the Commission's view that this disallowance could be equated to the increase in productivity of the petitioner's operations resulting from increased license contract services. This "productivity adjustment"[3] was made by the Commission in reliance upon the petitioner's proof of increased efficiency of operations because of the services and advice received and by inferring therefrom economies in terms of costs as the result of increased productivity. To reason otherwise, the Commission contends, would

2. Since 1974 the petitioner has paid to A T & T an amount equal to its allocated share of the total cost to A T & T in providing the services on a national scale, but said payments could not exceed 2½% of gross.

3. A productivity adjustment is an estimate of the amount by which operating expenses in the future will be reduced from those of the test period as the result of increased productivity of the petitioner's operations.

cause it to conclude that the contract expenditures by the petitioner would be unwarranted and imprudent.

■ However, the petitioner takes the position that the Commission's rejection of its increased contract costs to A T & T, based upon inflation, constitutes an impermissible double disallowance since the Commission had already made a productivity adjustment of $42.42 million reflecting projected improvements by the *operating departments of the petitioner* during the first year of the new rates. Accordingly, argues the petitioner, since reason and logic dictate that the inflationary disallowance ($6.89 million) cannot be related solely to *nonoperating departments of the petitioner* (staff, legal, business, etc.) it necessarily follows that a large portion of the inflationary disallowance is directly related to operations, an area already discounted by the $42.42 million disallowance. The Commission does not directly address this issue in its briefs but, rather, meets it tangentially by focusing on the view that the Commission was not dealing with a test year based solely on hard, objective fiscal facts, such as contracted-for wage increases, tax increases established by government authority and costs of materials. Necessarily, the Commission had to deal with less concrete items, such as attrition and erosion as well as inflation in determining what add-ons to test year results would be fair. In this connection the Commission correctly points to the sums of $65,149,000 and $62,469,000 allowed the petitioner as add-ons to costs for attrition and erosion, factors as speculative as those of inflation. It is the Commission's point that if the petitioner passively accepts the sum of $127 million as an add-on, it should not be heard to complain when the Commission disallows $6.8 million as an increased inflationary cost between the years 1975-76 based upon the Commission's conclusion that such increased costs are approximately equal to the increased productivity of the petitioner as a whole as a result of the services received from A T & T. We agree.

### V. WESTERN ELECTRIC CONTRACT DISALLOWANCE

■ Western Electric Company, Inc., a wholly owned subsidiary of A T & T, manufactures, furnishes and installs the bulk of the telecommunications equipment used by the petitioner. The Commission, of course, has the right to determine the reasonableness of prices charged by affiliated suppliers of a telephone company and to adjust the company's rate base

accordingly *(Matter of General Tel. Co. of Upstate N. Y. v Lundy,* 17 NY2d 373, 381, *supra).* In 1973 the Commission decided that post-1969 Western Electric charges reflected in the petitioner's rate base should be disallowed to the extent that they represent a higher rate of return for Western Electric than that allowed for petitioner itself *(New York Tel. Co.,* 13 NY PSC 1869, 1878-1883). The Commission reaffirmed this approach in 1975 and adjusted petitioner's rate base to reflect excess Western Electric profits from 1969 through 1974 *(New York Tel. Co.,* 15 NY PSC 1719, 1746). Here, the Commission again followed this method, but refused to consider evidence submitted by petitioner that the rates of return for Western Electric during 1975 and 1976 were substantially below those allowed for petitioner. Accordingly, a rate based disallowance of $9,949,000 was made. If the Commission had factored the 1975 and 1976 data into its excess profit calculations, the disallowance would have been $3,119,000. Petitioner contends that the Commission erred in refusing to consider this evidence. We agree.

Given the Commission's undoubted power to consider the reasonableness of the prices charged petitioner by its affiliated supplier *(Matter of General Tel. Co. of Upstate N. Y. v Lundy, supra,* p 381), we conclude that the selection of a method for determining the reasonableness of those prices requires expertise that is precisely within the realm of the Commission, but as with all such matters, its selection must have a sound basis in reason *(Matter of Niagara Mohawk Power Corp. v Public Serv. Comm. of State of N. Y.,* 59 AD2d 73, 75, *supra).* The Commission did not base its decision to reject the 1975 and 1976 Western Electric rate of return figures on a finding that those figures were anomalies and, therefore, not reflective of Western Electric's true rate of return. Rather, it appears that the Commission adopted its staff's theory that inclusion of the 1975 and 1976 figures would be tantamount to guaranteeing a rate of return to Western Electric. We find this reasoning specious at best. The determination of Western Electric's rate of return is used only to determine whether the prices paid by petitioner to Western Electric are reasonable and to adjust *petitioner's* rate base by the amount which represents excessive charges. The determination will, in no way, guarantee that *Western Electric* will make a profit, nor will it have more than an indirect impact upon petitioner's actual payments to Western Electric. The fact that the determination may have

some effect upon the earnings of A T & T, of which both petitioner and Western Electric are wholly owned subsidiaries, does not lend rationality to the Commission's determination.

Moreover, prior determinations by the Commission, inconsistent with its present posture, tend to support a conclusion that its determination is irrational. Thus, under similar circumstances the Commission determined that singling out the years in which profits were excessive overstates the net excess profits of the manufacturing affiliate, and concluded that a reasonable measure of the excess profits of the manufacturing affiliate should allow below-normal profits during the later years of the relevant period to offset the excess profits earned in the earlier years (*Chenango & Unadilla Tel. Corp.,* 16 NY PSC 810, 816. See, also, *Red Hook Telephone Co.,* 16 NY PSC 226, 227-228). The Commission's attempt to distinguish these cases upon the ground that the affiliates involved were much smaller than petitioner and Western Electric is not persuasive, particularly in light of the fact that the Commission has used all available post-1969 data for Western Electric in previous rate cases involving petitioner (see *New York Tel. Co.,* 13 NY PSC 1869, 1878-1883; *New York Tel. Co.,* 15 NY PSC 1719, 1746). Accordingly, we conclude that the Commission's refusal to include the 1975 and 1976 Western Electric data in its excess profits calculation without providing a sound basis in reason for so doing was arbitrary and capricious.

### VI. DISALLOWANCE OF SUMMER [1976] OVERTIME EXPENSES

The Commission disallowed $6,644,000 of revenue requirements of the petitioner on the ground that this sum represented overtime expenses incurred during the months of July and August, 1976 in connection with the Bicentennial Celebration and the Democratic National Convention held in New York City.

Unquestionably, the Commission has the right to eliminate abnormal, nonrecurring expenses from the revenue expectations of a utility to avoid a distorted result (see 3 PUR Digest 2d, Expenses, § 11, Abnormal and unusual expenses). Here, the petitioner's records contained a notation that it experienced unusually high overtime costs in the month of July because of vacations, the 4th of July celebration through-*out* the State and the National Democratic Convention. A similar notation for the month of August indicated high overtime costs due to hurricanes and vacations. Both the

Administrative Law Judge and the Commission adopted the view of the State Consumer Protection Board that all such expenses be disallowed as unrepresentative of future conditions. There must be a modification.

■ ■ While the petitioner's contention that abnormal or nonrecurring expenses should only be disallowed when the over-all amount of such expenses reaches an abnormal or nonrecurring level *(Matter of City of New York v Public Serv. Comm.,* 42 AD2d 259, app dsmd 33 NY2d 825) is correct, that maxim is inappropriate where, as here, there is a complete failure of proof that the utility experienced like expenses in any prior year. Such a showing could have probatively established that the costs herein disallowed were not so abnormal as to warrant disqualification as nonrecurring expenses. This failure of proof cannot be corrected by remitting to the Commission for receipt of evidence submitted after the hearings were closed. The rejected data must be considered self-serving in the absence of any opportunity to test such information by cross-examination. We conclude that the Commission was justified in refusing to consider such evidence. Consequently, in the absence of proof to the contrary, it was reasonable for the Commission to conclude that the unusually high overtime expenses incurred as a result of the Bicentennial Celebration and the Democratic National Convention were abnormal and nonrecurring. Both events were clearly unique, and inordinate costs associated with them are unlikely to occur in the future.

However, we conclude otherwise with respect to the overtime costs incurred during the months of July and August, 1976 not associated with the Bicentennial Celebration and the Democratic National Convention. Summer vacations and summer hurricanes are typically normal in the northeast and expenses incurred in connection with recurring events and phenomena are not so abnormal as to distort the typical operational costs of the petitioner incurred during the summer months. Therefore, on remand we direct that no overtime disallowance be made for the month of August, 1976 and that the disallowance for the month of July, 1976 be limited to overtime expenses that are reasonably related to the Bicentennial Celebration and the Democratic National Convention.

### VII. LEGAL EXPENSE DISALLOWANCE

■ Petitioner contends that the Commission erred in disallowing one half of the expenses incurred by petitioner as the

result of an antitrust suit brought by the Department of Justice against A T & T and its affiliates, including petitioner. The Commission reasoned that a question existed as to whether the present Bell System composition benefitted the ratepayers and, therefore, whether the legal expenses in defense of the antitrust suit were of benefit to petitioner's customers. The Commission decided to disallow one half of the expenses on the theory that settlement of the suit was likely and that as a result, the uncertainty as to whether the legal expenses were incurred for utility purposes would remain. The Commission has the authority to disallow legal expenses incurred for nonutility purposes *(Matter of New York Water Serv. Corp. v Public Serv. Comm. of State of N. Y.,* 12 AD2d 122, 128-129, mot for lv to app den 10 NY2d 705), and we conclude that the Commission's reasoning here was not without rational basis.

### VIII. TEN-MONTH SUSPENSION PERIOD

Subdivision 2 of section 92 of the Public Service Law provides that no rate increase shall become effective until 30 days after the filing of new tariffs, and the Commission is authorized to suspend the new rates for a period of up to 10 months pending a hearing and final determination as to whether the proposed rates are just and reasonable. In addition, the Commission is authorized to establish temporary rates during the suspension period. In an earlier related appeal, this court concluded that the maximum 10-month suspension period in this case began December 18, 1976 *(Matter of New York Tel. Co. v Public Serv. Comm. of State of N. Y.,* 59 AD2d 17, 20, mot for lv to app den 42 NY 2d 810, *supra),* and, thus, it would expire October 17, 1977. On October 13, 1977 the Commission authorized petitioner to put into effect, as temporary rates subject to refund, the annual rate increase recommended by the Administrative Law Judge, but directed that the rates not be effective until five days after service of the tariffs on all parties and after approval by the Commission. As a result, the temporary rates did not go into effect until October 27, 1977.

Petitioner contends that the Commission unlawfully extended the suspension period by 10 days. The Commission contends that, pursuant to subdivision 2 of section 92 of the Public Service Law, the temporary rates could not go into effect until 30 days after the tariffs were filed unless the 30-

day requirement was waived by the Commission, which the Commission did, in part. We conclude that the Commission's reliance upon the statute is misplaced.

As we read subdivision 2 of section 92, the 30-day period applies to tariffs seeking to impose *new rates* proposed by the utility rather than to *temporary rates* authorized by the Commission during the period that the new rates are suspended pending a hearing and final determination. The statute specifically authorizes the Commission to establish temporary rates, and it would be irrational to construe the statute as requiring that the utility must then give the Commission 30 days' notice of the rates it has already authorized.

In providing that the Commission may establish temporary rates during proceedings such as this, subdivision 2 of section 92 specifically refers to the authority contained in section 97 of the Public Service Law, which provides that "[i]f it shall be made to appear to the satisfaction of the commission that the public interest requires a change in the rate, charge or rental for telephone * * * service * * * or that such change is necessary for the purpose of providing adequate or sufficient service or for the preservation of the property, the commission may, *upon such terms, conditions or safeguards as it deems proper,* authorize an immediate, reasonable, temporary increase * * * pending a final determination" (Public Service Law, § 97, subd 1; emphasis added). Accordingly, we conclude that while the 30-day notice requirement of subdivision 2 of section 92 was not applicable to the temporary rates authorized by the Commission, the Commission may, pursuant to subdivision 1 of section 97, impose such terms, conditions or safeguards as it deems proper.

■ We find, however, that under the circumstances of this case, the conditions imposed were unreasonable. As we view the statutory scheme, petitioner was entitled to have its proposed rates go into effect at the end of the maximum 10-month suspension period unless a final determination had been made or unless temporary rates had been imposed pending a final determination (cf. *Matter of Chenango & Unadilla Tel. Corp. v Public Serv. Comm. of State of N. Y.,* 45 AD2d 409, 412-413, *supra).* The condition imposed by the Commission upon the temporary rates which it authorized deprived petitioner of this right. The Commission contends that the conditions were necessary in order to give it the opportunity to ascertain whether the tariffs submitted by petitioner cor-

rectly imposed the authorized temporary rates. While this rationale on its face seems reasonable and would justify a delay entirely within the suspension period, where, as here, the result is an extension of the suspension period, we find a sound basis in reason lacking, particularly since the Commission could have rectified any error in the tariffs imposing the temporary rates by appropriate adjustments in its final determination. Accordingly, we conclude that the rates in effect for the 10-day period following the end of the 10-month suspension period and prior to the effective date of the temporary rates were erroneous and an appropriate adjustment of the refunds ordered by the Commission should be made to correct these erroneous rates (see *Matter of Lefkowitz v Public Serv. Comm.,* 42 NY2d 998, amdg 40 NY2d 1047).

The determination should be modified by annulling so much thereof as (1) rejected the actual data submitted for the last six months of the test year; (2) refused to consider Western Electric's rates of return for 1975 and 1976 in the excess profits calculation employed to determine the amount of petitioner's payments to Western Electric to be excluded from the rate base; (3) excluded from the operating expenses overtime expenses for July and August, 1976 other than those attributable to the 1976 Bicentennial Celebrations and the Democratic National Convention; and (4) refused to offset the refunds which petitioner is required to pay by the amount which petitioner would have received had the temporary rates gone into effect on October 17, 1977 at the end of the 10-month suspension period, and matter remitted to the Commission for redetermination of the above issues in accordance with this opinion, and, as so modified, confirmed, without costs.

GREENBLOTT, LARKIN, MIKOLL and HERLIHY, JJ., concur.

Determination modified by annulling so much thereof as (1) rejected the actual data submitted for the last six months of the test year; (2) refused to consider Western Electric's rates of return for 1975 and 1976 in the excess profits calculation employed to determine the amount of petitioner's payments to Western Electric to be excluded from the rate base; (3) excluded from the operating expenses overtime expenses for July and August, 1976 other than those attributable to the 1976 Bicentennial Celebrations and the Democratic National Convention; and (4) refused to offset the refunds which pe-

titioner is required to pay by the amount which petitioner would have received had the temporary rates gone into· effect on October 17, 1977 at the end of the 10-month suspension period, and matter remitted to the Commission for redetermination of the above issues in accordance with this opinion, and, as so modified, confirmed, without costs.