In the Matter of ROCHESTER GAS AND ELECTRIC CORPORA-
TION, Petitioner, v PUBLIC SERVICE COMMISSION, Re-
spondent.

Third Department, April 8, 1982

APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (Richard N. George* of
counsel), for petitioner.

*David E. Blabey (Sigrid J. Hammond* of counsel), for
respondent.

OPINION OF THE COURT

LEVINE, J.

The commission's determination which petitioner (Roch-
ester) now seeks to review involves 2,800 acres of land
acquired between 1970 and 1974 in the Town of Sterling,
Cayuga County (the Sterling land). Rochester initially
purchased the land in contemplation of using it as a site for
several electric power generating plants it was then ex-
pecting to construct.

The Sterling land has been the subject of prior proceedings before the State Board of Electric Generation Siting and the Environment (the Siting Board) and two prior rate proceedings before the commission, each of which is pertinent to the issues presented in the instant case. The Siting Board was created by the then recently enacted article 8 of the Public Service Law (L 1972, ch 385), requiring board certification of environmental compatibility and public need before construction of electric power generating plants within the State. In 1973, Rochester applied to the Siting Board for permission to construct two 600 megawatt (Mw) fossil fuel plants on its Sterling property. Subsequently, Rochester submitted a second application for certification of the property, alternatively requesting permission to construct a single 1150 Mw nuclear power plant. The Siting Board decided these applications in 1978, granting certification for construction of a nuclear plant as to 1,244 acres of the Sterling land (the once-certified acreage), and rejecting certification for the remaining 1,556 acres (the never-certified acreage). In 1980, however, the Siting Board revoked its prior partial certification, based upon findings that no expansion of Rochester's capacity entailing use of the Sterling property would be needed before the early 1990's, and then, at most, only one half of the once-certified site's capacity would be used.

In a 1975 rate case before the commission, Rochester sought to have its Sterling investment included in its rate base under the commission account category of "land * * * held for future use * * * under a plan for such use" (16 NYCRR, Ch II, Subch F, Accounts, Account 105 B). The commission's decision of April 8, 1976, denied inclusion in the rate base. It ruled, however, that Rochester could report the investment on its books as a construction work in progress (CWIP) account, and thereby accrue interest on the investment as an allowance for funds used during construction (AFC). Through this accounting procedure Rochester would eventually receive compensation for carrying the investment by the addition of the accruals to the cost of original acquisition upon its inclusion in the rate base when the land was finally put in actual service as the site of a generating plant. In its 1979 rate proceeding,

Rochester sought inclusion of the never-certified acreage in the rate base. The commission rejected Rochester's request in a decision referring specifically to the 1978 denial of certification of that acreage by the Siting Board, and to the finding of the Administrative Law Judge that Rochester "is holding with only vague intentions of possible future use".

Rochester's attack on the commission's third and latest determination, denying present rate base inclusion for its entire Sterling property in the 1980 rate case, may be summarized as follows: In the early 1970's, the commission adopted a policy of encouraging electric utilities to expand their potential energy-producing capacity through acquisition of sites for future generating plants. Under that policy, it permitted the inclusion of sites in the rate base as land held for future use without requiring specificity of the "plan" referred to in Account 105 B. Rochester claims that it relied upon this policy when it acquired the Sterling land. In 1980, responding to a perceived diminishment of existing and future energy needs in the State, the commission announced a change in policy so as to require a definite plan of construction before property would be included in the rate base under Account 105 B. The commission's denial of inclusion of the Sterling property in the rate base in the instant case was on the basis of Rochester's failure to submit a definite plan for the land. The commission was thereby retroactively applying its new policy to an acquisition made under and pursuant to the former policy. As such, it is argued, the determination was arbitrary, capricious and confiscatory.

We disagree with Rochester's conclusions. Its initial premise that the commission's determination was based upon the 1980 change in policy requiring specificity in the plan requirements of Account 105 B is not supported by the record. In 1976, well before the adoption of the new policy, the commission refused to include the Sterling land in the rate base until the contingent prospects of eventual construction of plants were resolved in the then pending proceeding before the Siting Board. In 1979, still before any change in policy occurred, the commission denied inclusion of the never-certified acreage in the rate base

because the Siting Board's 1978 decision made the possibility of construction on that tract even more remote.

The commission's determination now under review followed the Siting Board's 1980 decertification of the remaining 1,244 acres, leaving Rochester without any existing legal authority to commence construction on any portion of the Sterling land. It was in the context of these developments since original acquisition that the commission imposed the burden on Rochester to show some realistic expectations that the site would eventually be put in service for electric power generation, by submission of a concrete plan for use. Thus a definite plan was deemed necessary under the specific circumstances presented, and not merely because of a change of policy concerning the plan requirement of Account 105 B.

Rochester's failure to furnish any assurance whatsoever that the Sterling site would be used at some point for power generation, coupled with the acknowledged reduced energy needs for Rochester's service area and the findings concerning Rochester's existing excess site capacity, afforded the commission a rational basis for its denial of inclusion of the Sterling property in the rate base. This is the appropriate standard of review in rate cases, including those where the matter at issue is, as here, the scope of the rate base (*Matter of Spring Val. Water Co. v Public Serv. Comm.,* 71 AD2d 55, mot for lv to app den 49 NY2d 706; *Matter of New York Tel. Co. v Public Serv. Comm.,* 64 AD2d 232, mot for lv to app den 46 NY2d 710). The scope of the rate base is, moreover, the kind of issue where deference is accorded to the commission's expertise (*Matter of Niagara Mohawk Power Corp. v Public Serv. Comm.,* 59 AD2d 73, app dsmd 437 US 901).

Rochester's suggestion that the issue of rate base inclusion of the Sterling property in 1980 must be determined on the basis of the circumstances, commission policy, and projection of future energy needs, all at the time of acquisition, is clearly without merit. In *Rochester Gas & Elec. Corp. v Public Serv. Comm.* (64 AD2d 345, affd 51 NY2d 823, app dsmd 450 US 961), it was held that " 'the Commission may not rely on a reckoning when actual experience is available and establishes that the predictions have

been substantially incorrect' " (*supra,* at pp 349-350, quoting from *Matter of New York Tel. Co. v Public Serv. Comm.,* 29 NY2d 164, 169). Likewise here, the commission ought not be bound by the projections of the early 1970's, and is permitted to take into account postacquisition events and circumstances in a current rate proceeding. The principle underlying any rate base question is that ratepayers should not be required to compensate a utility for use of its property unless such property is currently "used and useful" in the public service (Public Service Law, § 66, subd 16; 16 NYCRR 61.5). Although dormant property may nevertheless be "useful", by providing a reserve for anticipated future need and thus assuring sufficient uninterrupted service, it is not "useful", and thereby chargeable to present consumers, when the prospects of future need or use are entirely speculative.

Rochester's further argument that depriving it of a present return on the Sterling investment is confiscatory is equally unpersuasive. Under the present and previous commission decisions, its CWIP account for the Sterling acquisition has been receiving appropriate accruals of AFC.* Rochester is free at any time to decide whether to keep or dispose of the property without obtaining prior approval from the commission. The present record before us fails to substantiate Rochester's claim that its acquisition of the Sterling property was in reliance upon the earlier commission policy liberally interpreting the plan requirement of Account 105 B. At the time of acquisition, it had a definite plan for generating plant construction at the site which would have satisfied current commission policy. Any such reliance on commission policy would surely have been misplaced by 1972, when the Legislature created and conferred veto power upon the Siting Board concerning electric generating plant construction. In the determination now under review, the commission initiated, on its own motion, a separate proceeding now pending before it. In that proceeding, Rochester's plans for the development or sale of the Sterling property will be reviewed. If Roches-

---

* Accruals of AFC on the never-certified acreage were discontinued effective with the 1978 Siting Board final determination. Accruals of AFC on the once-certified acreage are continuing.

ter decides to dispose of the property, a proper allocation of any loss occasioned by acquiring and carrying the investment (adjusted in Rochester's favor by AFC accruals) will be made between Rochester and its customers. A fair allocation will avoid any possible confiscatory effects of postacquisition events over which the commission had no control. For all of the foregoing reasons, the commission's determination denying inclusion of the Sterling property in the rate base was rational, and clearly supported by substantial evidence.

The determination should be confirmed, and the petition dismissed, with costs.

MAHONEY, P. J., CASEY, MIKOLL and YESAWICH, JR., JJ., concur.

Determination confirmed, and petition dismissed, with costs.