OPINION OF THE COURT
Hancock, Jr., J.
Consolidated Edison (Con Ed) formally abandoned its unfinished Cornwall Pump Storage Facility on May 8, 1981. It had invested $41 million. On March 9, 1983 the Public Service Commission (PSC) approved an increase in electric rates for Con Ed amounting to $267 million per year. In permitting the rate increase, the PSC determined that Con Ed should be allowed full recovery for its investment by, (1) writing off the *209 investment as an extraordinary expense to be amortized over an eight-year period, and (2) earning a return on the unamortized portion of the investment by including it in the rate base. This determination of the PSC is challenged by the Attorney-General in the instant CPLR article 78 proceeding. Upon transfer of the proceeding to the Appellate Division, that court unanimously confirmed the PSC’s determination in an opinion and dismissed the petition (see, Matter of Abrams v Public Serv. Comma., 104 AD2d 135). We granted leave to appeal.
The Attorney-General contends that the determination of the PSC is unlawful and should be vacated entirely, or, failing that, at least in part. In essence, he argues:
1. That, as a matter of law, the Commission was prohibited from allowing Con Ed to recover any part of its investment in the abandoned project, even though prudently incurred, because the commission could not make the assertedly required threshold determination that the investment was "used and useful” in providing electrical service to the ratepayers.
2. That, even assuming the Commission had legal authority to permit Con Ed to recover the actual cost of the project by writing it off and amortizing it over eight years, its determination permitting Con Ed to include the expenditures in the rate base was, nonetheless, unlawful because it was based on a "mechanical” application of the "prudent investment” test which did not balance the interests of ratepayers and investors; and, therefore, the Commission should, at least be directed to modify its order by removing the $41 million investment from the rate base, and Con Ed should be compelled by the Commission to make appropriate refunds to the ratepayers.
For reasons stated hereafter, we reject these contentions and conclude that the judgment of the Appellate Division should be affirmed.
I
In the early 1960’s Con Ed decided to construct a pumped storage generating plant on a portion of Storm King Mountain in Orange County. The plan, known as the Cornwall Project, was to build a hydroelectric facility which would use conventional electrical power to pump water, during periods of slack demand, to a reservoir on the mountain approximately 1,000 feet above the Hudson River. During periods of peak demand, *210 the water stored in the reservoir would be permitted to fall through the facility’s turbines to the river below in order to generate needed power. The decision to proceed with the Cornwall Project was made amidst forecasts of a continuing increase in demand for electrical power.
The Federal Power Commission (FPC) granted a license for the Cornwall Project in 1965 but, because it was to be located in an area of historical significance and would use Hudson River water, various civic and environmental groups opposed the project and, in efforts to block it, engaged Con Ed in protracted litigation. In December 1965 the United States Court of Appeals for the Second Circuit vacated the license and remanded the matter to the FPC for further consideration (Scenic Hudson Preservation Conference v Federal Power Commn., 354 F2d 608, cert denied 384 US 941). After additional administrative proceedings, including extensive environmental impact hearings requested by the State of Connecticut and New York City, the proposed project was modified in minor respects and, in August 1970, the FPC again granted Con Ed a license to begin construction. Once more review was sought in the Second Circuit Court of Appeals and, in Scenic Hudson II (453 F2d 463, cert denied 407 US 926), the court upheld the FPC’s action in granting the license. Con Ed finally began construction at Cornwall in March 1974. Less than two months later, the Second Circuit Court of Appeals directed the FPC to reconsider the license application on the ground that the agency had earlier relied on inaccurate data concerning fish conservation (Scenic Hudson III [Hudson Riv. Fishermen’s Assn. v Federal Power Commn.], 498 F2d 827). Con Ed suspended construction in July 1974 and in August of that year the United States Court of Appeals enjoined any further operations.
The project was ultimately abandoned under a stipulation settling the litigation. Con Ed agreed to surrender its FPC license and to transfer certain Cornwall properties to the Palisades Interstate Park Commission and to the Village of Cornwall. In return, the project’s opponents agreed to drop their petition to have the EPA require Con Ed to install six cooling towers on four of its existing Hudson River generating facilities.
In the proceedings below, the Attorney-General relied primarily on Smyth v Ames (169 US 466) and argued, as he does here, that Con Ed is not entitled to any recovery of its investment inasmuch as the Cornwall Project cannot be said *211 to be "used and useful” in providing electric service. The Administrative Law Judge, however, ruled that the appropriate test was to be found in Justice Brandeis’s concurring opinion in Southwestern Tel. Co. v Public Serv. Commn. (262 US 276) — i.e., whether Con Ed’s expenditures had been "prudently undertaken”.[1] Reviewing the history of the Cornwall Project and concluding that Con Ed had acted reasonably in the belief that the project was sound, the Administrative Law Judge recommended that Con Ed be permitted full recovery of its investment.
The PSC adopted the conclusions of the Administrative Law Judge and approved the increase in electric rates. The Appellate Division, holding that under the rule enunciated in Power Commn. v Hope Gas Co. (320 US 591) the PSC was not obligated to use any particular formula or combination of formulae to determine rates,[2] found that the PSC’s application of the "prudent investment” test was fair and reasonable, and confirmed the determination.[3]
II
Setting utility rates presents "problems of a highly techni *212 cal nature, the solutions to which in general have been left by the Legislature to the expertise of the Public Service Commission” (Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672). Thus, Public Service Law § 72 empowers the PSC to consider all factors "which in its judgment” are relevant "with due regard among other things to a reasonable average return upon capital actually expended”. The PSC is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate (see, Matter of Cohalan v Gioia, 88 AD2d 722; Matter of New York Tel. Co. v Public Serv. Commn., 64 AD2d 232, 239, lv denied 46 NY2d 710). Section 72 mandates only that the rates fixed by the PSC be "just and reasonable” and, consequently, unless it is shown that the judgment of the PSC was exercised "without any rational basis or without any reasonable support in the record”, its determination is not to be set aside (Matter of New York State Council of Retail Merchants v Public Serv. Commn., supra, at p 672; see also, Matter of Campo Corp. v Feinberg, 279 App Div 302, 307, affd 303 NY 995).
The Attorney-General, while not disputing the extent of discretionary authority accorded the PSC, asserts that such authority is limited under both Federal and State law whenever a utility seeks to pass to the customers the costs of its investment in an unused and abandoned project. This is so, he contends, because the investment cannot be characterized as being "used and useful” in providing service to the public. The Attorney-General founds his argument on the 1898 decision of the United States Supreme Court in Smyth v Ames (169 US 466, supra). That case is generally recognized as the source of the "fair value” approach in determining the value of utility property (see, Rose, The Hope Case and Public Utility Valuation in the States, 54 Colum L Rev 188).
In Smyth v Ames (supra), the court held that a utility — a railroad in that case — was entitled to a fair return on the present fair value of the property being employed for the public convenience. The court went on to explain that, in determining fair value, several factors could be considered, including the reproduction cost of the property. The decision in Smyth v Ames came at a time of marked deflation following a long depression. The court’s adoption of the present value approach, and of replacement cost as one method of valuing the rate base, was "as a protection against inflated claims based on what were then deemed inflated prices of the past” (Southwestern Tel. Co. v Public Serv. Commn., 262 US 276, *213 298, supra [concurring opn of Justice Brandeis]). Notably, Smyth v Ames did not involve abandoned utility property. The question of whether such property could be included in the rate base was, consequently, not addressed. Clearly, the court’s decision does not stand for the bald proposition, urged by the Attorney-General, that the cost of abandoned property which is not "used and useful” in providing service may not be reflected in the rates, either by amortizing the costs or including them in the rate base. Rather, the Supreme Court in Smyth v Ames simply held that rates must reflect, at a constitutional minimum, the present "fair value of the property being used by [the utility] for the convenience of the public” (Smyth v Ames, 169 US 466, 546, supra).
Even assuming, however, that Smyth v Ames could be read as establishing the rule suggested by the Attorney-General, it is clear that such a rule does not prevail today. In 1942 in its decision in Power Commn. v Pipeline Co. (315 US 575), the Supreme Court overruled so much of Smyth v Ames as prescribed a requirement for valuation based on "fair value”. The court held that "[t]he Constitution does not bind the rate-making bodies to the service of any single formula or combination of formulas” (id., at p 586).[4] Two years later, in the landmark decision of Power Commn. v Hope Gas Co. (320 US 591, supra), the court reaffirmed the rules stated in Power Commn. v Pipeline Co. (supra), and added that "it is the result reached not the method employed which is controlling” (id., at p 602). Unless shown to be "unjust and unreasonable”, the rates are valid.
Accordingly, since Hope Gas Co., the courts and regulatory commissions in the several States have employed a variety of methods in valuing utility property including "fair value” (Smyth v Ames, supra), "prudent investment” (see, Justice Brandeis’s concurring opn in Southwestern Tel. Co. v Public Serv. Commn., 262 US 276, 292-295, supra), and original cost *214 (see, Rose, op. cit, 54 Colum L Rev 188). Similarly, in their treatment of investments in abandoned facilities, courts and commissions have applied both the "used and useful” and "prudent investment” tests with results ranging from total disallowance of costs to full recovery[5] (see, Pierce, Regulatory Treatment of Mistakes in Retrospect: Canceled Plants and Excess Capacity, 132 U Pa L Rev 497, 517-520; see generally, The Proper Regulatory Treatment of Investment in Cancelled Utility Plants, 13 Hofstra L Rev 469; Rodgers and Gray, State Commission Treatment of Nuclear Plant Cancellation Costs, 13 Hofstra L Rev 443).
In New York, the courts and the PSC have availed themselves of the latitude afforded by Hope Gas. Co. (supra) and have not insisted upon a rigid approach (see, e.g., Matter of Cohalan v Gioia, 88 AD2d 722, supra [approving inclusion in the rate base of construction costs of uncompleted nuclear plants]; Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 85 AD2d 486 [denying rate base inclusion as "land held for future use” of property acquired for siting of canceled nuclear plants]; Matter of Consumer Protection Bd. v Public Serv. Commn., 78 AD2d 65, lv denied 53 NY2d 607 [permitting inclusion in the rate base of $200 million of expenditures by LILCO for work in progress on nuclear plants under construction]). We note, however, that the PSC has characterized as "long standing” its own policy of generally favoring the recov *215 cry of whatever expenditures a utility can demonstrate to have been prudently incurred.[6]
It is evident, then, contrary to the Attorney-General’s position, that there is no Federal proscription against the use of the "prudent investment” test in the regulatory treatment of abandoned plants. Of course, the New York Public Service Commission is not bound under Hope Gas Co. (supra) to use the "prudent investment” approach and, indeed, it has not always done so (see, Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 108 AD2d 35, 37; Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 85 AD2d 486, supra). But if the end result is a just and reasonable balancing of consumer and investor interests, the PSC may employ the "prudent investment” test or any other formula or combination of formulae without offending the Federal Constitution or decisional law.
Ill
The Attorney-General argues, however, that notwithstanding the latitude permitted in the Federal cases, the recovery of any part of the costs of an abandoned project, even if prudently undertaken, contravenes the law of New York. He notes that this court has never addressed the issue. We now address briefly, each of his two points.
First, he maintains that the legislative history of Public Service Law § 72 compels an interpretation precluding recovery of utility investments which are not actually used and useful. He contends that the Legislature adopted the "just and reasonable” criterion for fixing electrical rates (see, L 1910, ch 480) in order to incorporate the "used and useful” limitation of Smyth v Ames (169 US 466, supra) into the statute. The short answer to that argument is that Smyth v Ames contains *216 no such limitation (see, Point II, supra). Beyond that, however, there has never been language in section 72 or in any of its prior variants suggesting that the PSC could not, in a proper case, permit recovery for abandoned investments prudently incurred.[7] Clearly, the plain meaning of "just and reasonable” in no way reflects the restrictive import which the Attorney-General urges. Indeed, the statutory language explicitly authorizing the PSC to consider all relevant factors in fixing rates, "with due regard among other things to a reasonable average return upon capital actually expended” (Public Service Law § 72 [emphasis added]) would seem to compel just the opposite conclusion.[8] Absent any legislative history or legal authority to support the Attorney-General’s interpretation of Public Service Law § 72, we decline to adopt it.
The Attorney-General also insists that the PSC’s policy of using the "prudent investment” approach is wrong. He argues that it insulates investors from the economic consequences of an abandoned investment, removes their incentive to hold management accountable for unsuccessful business decisions and, moreover, does nothing to discourage overinvestment in capital assets.[9] The Attorney-General would have us read into Public Service Law § 72 a prohibition against any recovery for investments in abandoned projects under the "used and useful” test, even if prudently made. Whatever the merits of *217 these contentions, plainly they involve questions of regulatory policy more properly addressed to the Legislature.[10]
IV
The Attorney-General argues alternatively that the PSC erred in its "mechanical” application of the "prudent investment” test and in its failure to balance the interests of the investors and ratepayers. He notes that other regulatory commissions, while allowing recovery of the actual costs of investments in canceled facilities, have, at the same time, disallowed inclusion in the rate base of the unamortized investments in those facilities (see, e.g., Re Bangor HydroElectric Co., 46 PUR 4th 503, 556-558 [Me PUC 1982]; Re Jersey Cent. Power & Light Co., 44 PUR 4th 54 [NJ Bd Pub Util 1981]; see generally, Pierce, op. cit, 132 U Pa L Rev, at 517-520). The Attorney-General contends that the PSC should have followed that course here.
The PSC does have the discretion under Hope Gas Co. to permit no more than partial recovery of investment in a subsequently abandoned facility. As the Appellate Division noted in a recent case: "While it is true that a regulated company is generally entitled to recapture its prudently incurred costs, including a return on its investment (see, Power Cornmn. v Hope Gas Co., 320 US 591, 603), due process does not 'insure values or * * * restore values that have been lost by the operation of economic forces’ (Market St. Ry. Co. v Commission, 324 US 548, 567). Neither justice nor the Constitution obliges consumers to ensure a profitable return on an unprofitable enterprise * * * (see, San Diego Land & Town Co. v Jasper, 189 US 439, 446-447).” (Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 108 AD2d 35, 37, supra.) Indeed, the PSC may, when appropriate, even exercise its discretion to deny any recovery at all (see, Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 85 AD2d 486, supra).
But that is not to say that the allowance of full recovery here was an abuse of that discretion. As we have noted, the setting of rates presents technical problems which have been left by the Legislature to the expertise of the PSC (see, Matter *218 of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672, supra). Only when the exercise of the PSC’s judgment can be shown to be without any rational basis or any reasonable support in the record may its determination be set aside (see, Matter of Campo Corp. v Feinberg, 279 App Div 302, 307, affd 303 NY 995, supra). We agree with the court below that such a showing has not been made here.
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Meyer, Simons, Kaye, Alexander and Titone concur.
Judgment affirmed, with costs.

. In Southwestern Tel. Co. v Public Serv. Commn. (262 US 276, 290) Justice Brandéis noted, in what has since become an oft-quoted observation, that what is "devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise”.

. As the Appellate Division noted, the rule in Power Commn. v Hope Gas Co. (320 US 591) has been previously applied by courts in this State. (See, Matter of Consumer Protection Bd. v Public Serv. Commn., 78 AD2d 65, 67, lv denied 53 NY2d 607, citing Matter of New York Tel. Co. v Public Serv. Commn., 64 AD2d 232, lv denied 46 NY2d 710; see also, Matter of Consolidated Edison Co. v New York State Public Serv. Commn., 53 AD2d 131, lv denied 40 NY2d 803.)

. In finding that there was a rational basis for the determination, the Appellate Division stated: "The means for generating electricity can only be accomplished by long-range planning and implementation. In 1965, a prudent planner anticipated a progressively greater demand for electricity in the New York City area serviced by Con Ed. The pumped-storage concept was specifically suited for anticipated demands. Con Ed cannot be faulted for not anticipating either the environmental opposition or the oil embargo which caused its customers to become energy conscious and resulted in decreased demands. The decision, when made, was with the reasonable expectation and commitment that the Cornwall project would become a generating plant used and useful in the production of electricity for customers of Con Ed” (104 AD2d 135,138).
Indeed, in his reply brief to this court, the Attorney-General writes that ”[t]he Cornwall project was a failure, albeit a prudently conceived one” (Attorney-General, Reply Brief, at 1, 2).

. In their concurring opinion in Power Commn. v Pipeline Co. (315 US 575, 606), Justices Black, Douglas and Murphy stated with respect to the majority opinion: "As we read the opinion of the Court, the Commission is now freed from the compulsion of admitting evidence on reproduction cost or of giving any weight to that element of 'fair value.’ The Commission may now adopt, if it chooses, prudent investment as a rate base — the base long advocated by Mr. Justice Brandéis. And for the reasons stated by Mr. Justice Brandéis in the Southwestern Bell Telephone case, there could be no constitutional objection if the Commission adhered to that formula and rejected all others”.

. We note with interest the decisions of the United States Court of Appeals (DC Cir) in Jersey Cent. Power & Light Co. v Federal Energy Regulatory Commn. (730 F2d 816, vacated on reh 768 F2d 1500, vacated for en banc hearing 776 F2d 364, reargued Jan. 30, 1986).
The following remarks, which were made in the court’s second opinion and whose validity does not depend on the ultimate outcome of that case, are particularly relevant to this appeal: "[W]e have long held that the Commission is free to use various methods of computing a rate base so long as the end result of the rate order falls within the zone of reasonableness. Thus, we have previously upheld use of both the so-called 'used and useful’ method, first set out in Smyth v. Ames, 169 U.S. 466, 546, 18 S.Ct. 418, 42 L.Ed. 819 (1898), and the far more sensible 'prudent investment’ method, developed by Justice Brandéis in Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 289, 43 S.Ct. 544, 547, 67 L.Ed. 981 (1923) (Brandéis, J., dissenting), and approved by this court in Washington Gas Light Co. v. Baker, 188 F.2d 11. The 'prudent investment’ method has some advantages over the 'used and useful’ method because it treats utilities more like other businesses by allowing them to start recovering future development costs as they are incurred. Nonetheless, use of either method is certainly permissible so long as a reasonable balancing of consumer and investor interests is achieved as the end result.” (768 F2d, at p 1504, n 4.)

. In Opinion No. 82-4 in which it allowed Niagara Mohawk to commence recovery of its Sterling investment, the Commission, in rejecting arguments of the Attorney-General similar to those made here, stated (see, at p 75): "DOL argues on exceptions that because the Sterling facility is not 'used and useful’ and never will be, NMP should be precluded from recovering its Sterling investment. According to DOL, an apparently prudent capital expenditure that ultimately turns out to be useless may not lawfully be admitted into rate base, for, it says, 'ratepayers cannot lawfully be required to cover management’s investment error.’ * * * we rejected in the Sterling proceeding arguments similar to those raised by DOL here, finding that our longstanding policy favored the recovery of all prudently incurred expenditures in rates”. (See also, Gary and Roach, supra, at 473-474, 498-499.)

. It should be noted that in 1984 the Attorney-General sought adoption of an amendment to the Public Service Law which would have prohibited rate recovery of utility investments not "actually used and useful.” (New York Assembly Bill No. 9254.) The amendment was not adopted and section 72 remains unchanged. A few States now have statutes that may be interpreted as disallowing any recovery for investments in canceled plants (see, e.g., Ohio Rev Code Ann § 4909.15 [A] [4]; Pierce, Regulatory Treatment of Mistakes in Retrospect: Canceled Plants and Excess Capacity, 132 U Pa L Rev 497, 519-520).

. It is significant that the phrase "with due regard among other things to a reasonable average return upon capital actually expended” was added to the statute at the same time as "just and reasonable” which the Attorney-General contends was intended to incorporate the "used and useful” test (Public Service Commissions Law, L 1910, ch 480, Cons Laws 1910, ch 48).

. It is the PSC’s view that shifting a major cost of prudent investments to the shareholders would have the inevitable effect in the market of raising capital costs and that the cost to the ratepayers would be higher in the long run if such policy were adopted (see, Consolidated Edison Co., 21 NY PSC 673, 691-694, 779-791 [1981]; Sterling Loss Proceeding — Opinion and Order Prescribing Treatment of Sterling Expenditures in Rates, PSC Case No. 27794, Opinion No. 82-1 [Jan. 13, 1982], at 3-35; Recommended Decision— Phase I-A [Sept. 8,1981]).

. Presumably some or all of these arguments were made in 1984 when the Attorney-General sought amendment of Public Service Law § 72 (see, n 8, supra). For a detailed discussion of various approaches adopted in other States in the treatment of investments in canceled plants see Pierce (supra, n 7, 132 U Pa L Rev 497, 507-520).