In the Matter of MCI Telecommunications Corporation, Petitioner, and New York State Consumer Protection Board, Intervenor-Petitioner, v Public Service Commission of the State of New York et al., Respondents. (And Two Other Related Proceedings.)

Third Department, May 9, 1985

**APPEARANCES OF COUNSEL**

*Morrison & Forester* (*Henry D. Levine* and *Brian Busey* of counsel), and *McNamee, Lochner, Titus & Williams, P.C.* (*George F. Carpinello* of counsel), for MCI Telecommunications Corporation, petitioner.

*Reboul, MacMurray, Hewitt, Maynard & Kristol* (*Robert L. Sills, Robert M. Peak* and *Richard J.J. Scarola* of counsel), and *Deborah A. Dupont* for GTE Sprint Communications Corporation, petitioner.

*Frank M. Steadman, Jr.,* and *Dorothy F. Gray* for AT&T Communications of New York, Inc., petitioner.

*David E. Blabey* (*Margery F. Baker* of counsel), for Public Service Commission of the State of New York, respondent.

*John M. Clarke, Gerald E. Murray* and *Campbell L. Ayling* for New York Telephone Company, respondent.

*Read & Laniado* (*Sam Laniado* of counsel), for Warwick Valley Telephone Company, respondent.

*Joel Blau* and *Philip Shapiro* for New York State Consumer Protection Board, petitioner-intervenor.

### OPINION OF THE COURT

LEVINE, J.

The instant proceedings have their genesis in two historic, modern developments in the telecommunications industry in the United States. The first of these was the entry in the early 1970s of independent carrier companies, commonly referred to as other common carriers (OCCs), into the long-distance telecommunications market theretofore monopolized by American Telephone and Telegraph Company (ATT). This was permitted to occur as a result of new technologies and of Federal court and Federal Communications Commission (FCC) rulings requiring ATT's Bell operating companies (BOCs), such as respondent New York Telephone Company (NYT) in this State, to provide OCCs with access to their facilities serving local telephone subscribers at the originating and terminating ends of long-distance telephone calls (*see, e.g., Specialized Common Carrier,* 29 FCC2d 870, *affd sub nom. Washington Utils. & Transp. Commn. v Federal Communications Commn.,* 513 F2d 1142, *cert denied sub nom. National Assn. of Regulatory Util. Commrs. v Federal Communications Commn.,* 423 US 836; *MCI Telecommunications Corp. v Federal Communications Commn.,* 561 F2d 365, *cert denied* 434 US 1040, 580 F2d 590, *cert denied* 439 US 980). Petitioners MCI Telecommunications Corporation (MCI) and GTE Sprint Communications Corporation (GTE Sprint) and other OCCs were thus enabled to link each end of long-distance telephone calls to and from local subscribers through the subscribers' telephone connections to local telephone exchanges. The local companies, whether BOC subsidiaries or independents, charged the long-distance carriers a fee for providing such linkage at each end of the call (the access charge). However, due to the technological design of the exchange connections, the access service made available to OCCs by BOCs was inferior in various respects to that available to ATT. The OCCs resisted paying access charges equal to that charged ATT and, through negotiations supervised by the FCC,

an agreement was reached between the OCCs and the BOCs, known as the "ENFIA" agreement, under which OCCs paid a lesser access charge than that charged ATT.

The second revolutionary event was the 1983 ATT divestiture consent decree approved by the United States District Court's modified final judgment (MFJ) in the Federal antitrust action against ATT (*United States v American Tel. & Tel. Co.,* 552 F Supp 131, *affd sub nom. Maryland v United States,* 460 US 1001). Insofar as relevant here, the MFJ (1) divested ATT of its BOC subsidiaries; (2) barred the BOCs from providing long-distance service outside specified, geographically based exchange areas referred to as local access and transportation areas (LATAs) (New York is divided into six such LATAs); (3) required BOCs to transfer to ATT the rights to provide long-distance *intrastate* service between LATAs; (4) required BOCs over a specified period of years to make the technological changes necessary to provide access to OCCs equal in quality and price to that available to ATT; and (5) abrogated all existing agreements on access charges, with the direction that such charges be set by the FCC and State regulatory agencies. While recognizing that, pending achievement of equal access, OCCs were at a competitive disadvantage to ATT in providing long-distance service, the District Court refrained from setting an access charge differential in the interim period, but invited this to be done by the FCC and State regulators (*United States v American Tel. & Tel. Co.,* 552 F Supp 131, 199, n 287, *supra*). However, the District Court directed that, in general, access charges be cost-based and differ only on a cost basis insofar as quality of service differs. A premium charge for differences in quality of service not accompanied by differing costs was permitted, but not required, under the MFJ (*supra*).

Following the divestiture decree, the FCC issued the first of three decisions in which it addressed the need for a rate structure for interstate telecommunications access charges reflecting the difference in quality of access services available to ATT and the OCCs (*Matter of MTS/WATS Market Structure,* 93 FCC2d 241). That order broke down the access charges into two cost recovery components of the local operating companies' expenses relating to providing access: (1) traffic sensitive costs, representing costs that vary in proportion to access usage; and (2) nontraffic sensitive (NTS) costs, generally representing initial or intermittent costs of facilities necessary to provide subscribers a connection with local exchange and interexchange services. Regarding NTS costs, the FCC adopted a policy leading to the

eventual full recovery thereof through flat charges to subscribers ("end user" charges) rather than through access charges, thereby ending what had been, in effect, a subsidy of subscriber access costs through long-distance tolls. The FCC's order began the phasing out of recovery of NTS costs through access charges. After finding that the OCCs' access was inferior to ATT's, the FCC imposed a premium access charge equivalent to 22% of the OCCs' access charges. In July 1983, the FCC adopted its initial reconsideration order (48 Fed Reg 42984), increasing the premium access differential to 35% based upon the "opportunity costs" to OCCs of the inferior access service. Finally, shortly after respondent Public Service Commission (PSC) made its determination now under review, the FCC issued a further reconsideration opinion (49 Fed Reg 7810), increasing ATT's premium access differential to 55%, on the basis of the need to further offset ATT's competitive advantage from superior access during the period before equal access is attained.

In January 1983, the PSC instituted the proceeding on intrastate long-distance access charges, the determination of which is now under review. The succeeding December, after hearings were concluded, the Administrative Law Judge (ALJ) issued a comprehensive recommended decision. The following pertinent findings and recommendations were made: (1) the quality of ATT's access (called Feature Group C) should be compared to the quality of the most prevalent access service afforded OCCs (called ENFIA A or Feature Group A); (2) the OCCs' Feature Group A service was inferior to ATT's Feature Group C access (which NYT also enjoyed in providing *intra*-LATA long-distance service) in seven respects, namely, (i) a long-distance call through an OCC requires using more than twice the number of digits than a call through ATT's New York long-distance subsidiary, petitioner AT&T Communications of New York, Inc. (ATTCOM); (ii) the OCCs' customers are charged for message units from the moment the OCC terminal "answers", irrespective of whether the called party is actually reached; (iii) the OCCs' systems cannot be used for long-distance calling via unmodified rotary dial telephones, still the most common equipment used by New York subscribers; (iv) the OCCs' connections do not provide "answer or disconnect supervision" signals to facilitate accurate measurement of the time of the call and OCCs have employed expensive procedures to overcome this deficiency; (v) the OCCs' access lacks automatic number identification capability to inform the exchange of the telephone number from which the call is placed, requiring the use of

customer identification code numbers and specialized equipment to prevent fraud; (vi) the OCCs' access lacks multifrequency pulsing and is therefore inferior in speed, accuracy, range and holding time per call; and (vii) the OCCs' access is inferior with respect to signal quality, leading to a greater risk of voice signal loss and extraneous noise; (3) the ALJ rejected the FCC's policy of immediately beginning the shifting of recovery of NTS costs from access charges to end user flat fees, recommending instead a "freezing" of the current rate of recovery of NTS costs through access charges; (4) that apart from any premium to be charged to ATTCOM for its superior access, New York inter-LATA access charges should generally "mirror" the interstate rates set by the FCC, it appearing then that the total costs of providing access are roughly equivalent at both interstate and intrastate levels; (5) that ATTCOM obtained a competitive advantage over the OCCs by reason of its superior access which should be ameliorated by imposing a premium access charge; (6) that such premium should be set in an amount estimated to make up the shortfall in recovery of NTS costs due, *inter alia,* to the freezing of such recovery at current rates, which came to an access charge differential as between the OCCs and ATTCOM[1] of 22% of NTS costs; and (7) the ALJ recommended that no premium access charge be imposed upon NYT for its similarly superior access in intra-LATA long-distance telecommunications because its competitive advantages over OCCs was counterbalanced by other significant competitive disadvantages.

On exceptions to the PSC, the ALJ's recommended decision was essentially adopted with three notable modifications. First, although the PSC accepted the ALJ's imposition of a 22% premium charge on ATTCOM's access, it restricted application thereof to ATTCOM's originating minutes, charging no premium for access at the terminating end of a long-distance call. Second, the PSC further restricted application of the premium to those geographical areas of the State where ATTCOM and the OCCs were in actual competition.[2] Finally, rather than adopting the ALJ's recommendation to fix the amount of the premium with the object of recovering the shortfall in NTS cost contributions previously described, the PSC determined that the NTS cost recovery deficit should be made up by a uniform charge

---

**1.** It should be noted that by reason of the method of charging, accounting for and distributing the revenues from access charges, the premium to ATTCOM can equally be viewed as a discount to the OCCs and their customers. The premium, according to the ALJ, equaled 1 cent per minute of use.

**2.** This was subsequently determined to cover roughly 70% of the State.

against all long-distance carriers and that the ATTCOM access premium should be applied to amortize an access-unrelated expense account. After petitioners' application for a rehearing was denied, the instant CPLR article 78 proceedings were commenced.

■ Initially, we reject the PSC's contention that the petitions should be dismissed on the ground that the determination sought to be reviewed is nonfinal, because the rates implementing its determination were set temporarily and were subject to refund. There is nothing to indicate that the rate structure embodied in the PSC's order, establishing, *inter alia,* the premium to be charged ATTCOM and refraining from imposing such a premium on NYT, was anything but final. The determination clearly and immediately affected the rights and liabilities of the parties with respect to access charges and was final and binding as such (*Matter of Abrams v Public Serv. Commn.,* 96 AD2d 701, *affd* 61 NY2d 718; *Matter of Filut v New York State Educ. Dept.,* 91 AD2d 722, 723, *lv denied* 58 NY2d 609). The fact that the PSC reserved the right to make subsequent retroactive revisions in the rates for access does not render an otherwise final order nonfinal (*Matter of Abrams v Public Serv. Commn., supra,* p 702; *see also, Matter of Seidner v Town of Colonie, Bd. of Zoning Appeals,* 79 AD2d 751, 752, *affd* 55 NY2d 613).

■ We may with equal alacrity dispose of ATTCOM's objection to the setting of any premium access charge. There is ample evidence in the record to support the PSC's finding, consistent with that of the United States District Court in the Federal antitrust action (*United States v American Tel. & Tel. Co.,* 552 F Supp 131, *supra*) and that of the FCC (*Matter of MTS/WATS Market Structure,* 93 FCC2d 241, *supra*), that ATTCOM's access to local exchanges was superior to that of the OCCs and gave it a distinct advantage over its long-distance competitors. The PSC can validly set differential utility rates on considerations other than relative costs, so long as they are otherwise rationally based (*Matter of New York State Council of Retail Merchants v Public Serv. Commn.,* 45 NY2d 661, 669), and may do so (as it did here) on account of competitive effects, relative market positions and the greater value of the service to a class of customers (*Matter of General Tel. Co. v Lundy,* 17 NY2d 373, 385; *Matter of Tele/Resources, Inc. v Public Serv. Commn.,* 58 AD2d 406, 411, *lv denied* 43 NY2d 647; *Matter of City of New York v Feinberg,* 279 App Div 817, 818).

We likewise find no basis upon which to upset the PSC's decision not to impose an access premium on NYT for the

superior quality of its intra-LATA long-distance access service. Unlike the OCCs or ATTCOM, NYT is required on the one hand to fully furnish intra-LATA toll service and prohibited on the other from competing in the inter-LATA market, from which it derived substantial revenues prior to the ATT divestiture. Each of these factors has negative competitive and economic effects upon NYT, as is fully outlined in the ALJ's recommended decision. Moreover, superimposing upon these disadvantages an additional premium would, as the ALJ noted, "put upward pressure on shorthaul toll rates, which must be decreased if they are to be priced more nearly at cost". Thus, a clearly discernible rational basis exists for the decision not to exact an access premium against NYT.

We next address the objections of MCI and GTE Sprint to the adequacy of the ATTCOM premium access charge fixed by the PSC. The ALJ determined that the appropriate surcharge was 22% of the NTS cost element of the total access charges. In doing so, he rejected the OCCs' suggestion that the premium should mirror either (1) the interstate charge differential contained in the predivestiture ENFIA agreement between the OCCs and ATT, or (2) the 35% premium found by the FCC in its 1983 intitial reconsideration order (48 Fed Reg 42984) to be the value of the differences in quality of interstate access, based on the "opportunity costs of the superior access", i.e., the difference between what competitors in a free market would pay for the inferior access and for the superior access. As the ALJ noted, the ENFIA agreement differential was fixed under entirely different circumstances, exceeded all other premium calculations and had no evidentiary support in the record apart from its own existence. The ALJ was also justified in rejecting an opportunity cost approach to fixing the premium because of the absence of sufficient data specifically addressed to its application in New York State. In both of these respects, the weight (or lack thereof) to be given to the OCCs' evidence was well within the province of the regulatory agency fact finder.

Conceding that the 22% premium failed fully to reflect the differences in quality of access or to "mirror" the FCC's then current 35% access rate differential, the ALJ justified the recommended rate on the basis of differences between the intrastate and interstate long-distance telecommunications markets and the economic inefficiency of imposing a substantial premium on ATTCOM (or a corresponding discount in favor of the OCCs), which would "promote investment in inefficient access arrangements just a few years before they are scheduled to be replaced by other access arrangements which will provide all

interexchange carriers with equal access". In other words, the ALJ's recommended rate differential represents a balancing of the need to offset ATTCOM's advantages and thus to preserve competition in the inter-LATA market against the countervailing effect which the premium would have in promoting competition at an artificial and uneconomic level, particularly with equal quality access to all competitors on the horizon. Moreover, as the ALJ noted, ATTCOM is itself competitively disadvantaged in being required to serve all inter-LATA routes, while the OCCs are permitted to select only the most profitable ones. The ALJ's recommendation seems to us to fall directly within the area where a court may not substitute its judgment for that of the regulatory agency "giving fair consideration to the expertise possessed by the commission in weighing the impact of rate-fixing factors on both the utilities and the consuming public" (*Matter of New York State Council of Retail Merchants v Public Serv. Commn.*, 45 NY2d 661, 669-670, *supra*). Thus, since the PSC essentially approved and adopted the ALJ's recommendations and reasoning with respect to the basic 22% ATTCOM premium, its determination must be upheld.

█ We reach a different conclusion with respect to the PSC's modifications of the ALJ's recommendations, restricting application of the premium charge for ATTCOM's access to the originating end of long-distance calls and to those areas of the State where ATTCOM and the OCCs presently compete. The PSC, in addition to adopting the rationale of the ALJ in fixing the premium charge at 22% of NTS costs, expressed as its objective the achievement of a proper balance between "insuring the availability of reasonably-priced service by AT&T for the majority of New York customers * * * and avoid[ing] affording an undue competitive advantage to any carrier during the transition to equal access". These two departures from the ALJ's recommendations were never raised or otherwise litigated at the hearing before the ALJ, never considered by him nor briefed before the PSC. Consequently and understandably, there is a lack of any evidentiary support in the record for the further restrictions placed upon the ATTCOM surcharge, and an equal lack of any basis upon review to determine whether the reductions are consistent with the balancing of the various relevant rate-making factors and the ultimate objectives identified by the ALJ and the PSC. Regarding the decision to limit the premium to originating access charges, the PSC's rationale is that the inferior access is "perceptible primarily [by customers] on the originating end of toll calls" and that "the most obvious aspects of inferior access" arise at the originating end. Undeniably,

however, several of the seven qualities of the OCCs' access identified as inferior to that of ATTCOM's are equally if not more applicable to the linkage at the terminating end than at the originating end, resulting in competitive disadvantages to the OCCs in regard to quality and cost. The PSC conceded as much in the decision on rehearing. If distinctions between carriers by the PSC are to be rationally based, they must be made on matters of substance and not mere appearance.

The lack of a rational or evidentiary basis for the further restriction of the additional charge to areas of actual long-distance service competition is best revealed by the fact that NYT was unable to implement that aspect of the PSC's rate structure in its proposed tariff filed in response to the determination herein and, accordingly, NYT was permitted to set a State-wide premium charge against ATTCOM reduced by an additional 35%. Moreover, the OCCs' freedom to choose their areas of competition was a major factor relied upon by the ALJ in reducing the premium to 22% of NTS costs. The PSC adopted the ALJ's reasoning in this regard, but then, in effect, based this further reduction in the premium on what is essentially the same factor.

Nor can we accept the PSC's attempted justification (in its rehearing decision) for upholding these further reductions in the premium on the basis that the "end result nevertheless represents a reasonable attempt at balancing" the competitive/economic considerations. MCI and GTE Sprint have demonstrated without contradiction that the "end result" of the PSC's final access charge determination is an ATTCOM premium charge which is only 5% in excess of the OCCs' access charges, translatable into a difference in customer tolls per minute of use of only a fraction of a cent. Having once determined that just and reasonable rates for long-distance access services require a differential to reflect the clearly superior quality of ATTCOM's access and to offset the competitive advantage gained thereby, the PSC was not free to ignore its own standard and set the premium at a de minimis level (cf. Matter of New York Tel. Co. v Public Serv. Commn., 62 NY2d 57, 64). This is even more true where, as here, the record lacks any evidentiary basis whatsoever to show that the premium as finally reduced would be at all efficacious in preserving competition or that a higher premium would have any significant impact on the "availability of reasonably-priced services by AT&T for the majority of New York customers".

For the foregoing reasons, the PSC's determination should be modified by annulling so much thereof as restricted the applica-

tion of the 22% premium access charge imposed against ATTCOM to the originating minutes of use and to the areas of the State where ATTCOM competes with other long-distance carriers.

MAHONEY, P. J., CASEY and WEISS, JJ., concur.

Determination modified, without costs, by annulling so much thereof as restricted the application of the 22% premium access charge imposed against petitioner AT&T Communications of New York, Inc., to the originating minutes of use and to the areas of the State where said petitioner competes with other long-distance carriers, and, as so modified, confirmed.