In the Matter of RICHARD M. KESSEL, as Executive Director of the State of New York Consumer Protection Board, Petitioner, v PUBLIC SERVICE COMMISSION OF STATE OF NEW YORK et al., Respondents, and NEW YORK STATE TELEPHONE ASSOCIATION, Intervenor-Respondent. (And Two Other Related Proceedings.)

Third Department, March 3, 1988

APPEARANCES OF COUNSEL

*Joel Blau* for petitioner.

*Robert A. Simpson (Marilyn Mann Faulkner* of counsel), for Public Service Commission of State of New York, respondent.

*John M. Clarke (Davis Polk & Wardwell* of counsel), for New York Telephone Company, respondent.

*Read & Laniado (Howard J. Read* of counsel), for intervenor-respondent.

**OPINION OF THE COURT**

CASEY, J.

In these three CPLR article 78 proceedings, the State Consumer Protection Board and others (hereinafter collectively referred to as petitioner) seek to annul certain portions of determinations made by respondent Public Service Commission (hereinafter the PSC) concerning the rates charged by respondent New York Telephone Company (hereinafter NYT). In particular, petitioner raises a number of procedural and substantive objections aimed at two separate and distinct aspects of the rate-making process: (1) the moratorium plan which permitted NYT to file a second-stage and third-stage rate increase limited to certain items, and (2) the removal of the recovery of nontraffic sensitive costs from interexchange access charges and intra-LATA toll rates. An understanding of the terminology, procedural background and relevant facts for each of these aspects is essential to the resolution of the issues raised by petitioner. As a matter of convenience, the remainder of this decision shall be divided into two parts, which will discuss the moratorium plan and the reallocation of nontraffic sensitive costs.

**THE MORATORIUM PLAN**

The moratorium plan is an outgrowth of the PSC's continuing effort at restructuring the rate-making process to avoid the instability, expense and inefficiency resulting from successive general rate case filings. In November 1977, the PSC issued a "Statement of Policy on Test Periods in Major Rate Proceedings" ([1977] 17 PSC 25-R), in which the PSC reaffirmed that its goal was "to set rates on the basis of the utility's projected rate base, revenues and expenses in the first 12 months of new rates" ([1977] 17 PSC 26-R). To achieve this goal, and to end the confusion and inefficiency arising out of the utilities' use of various test year periods since the traditional fully historic test year period proved unsuitable in the early 1970s, the PSC adopted a specific policy on test years, requiring data for a historic test year ending just prior to the rate filing and a projected revenue requirement for the first

year of the new rates (called the rate year), with "a verifiable link between the two periods" ([1977] 17 PSC 26-R).

The use of a projected rate year did not solve the problem created by large cost increases which are virtually certain to occur during the rate year but are difficult to forecast quantitatively. In addition to the difficulty in projecting the amount of the cost increase, the full annual effect of the increase could not be included in the rates since the cost increase would occur during the rate year and thus would not be in effect for the full year upon which the rates are based.[1] As a result, the utility would have to seek another general rate increase at the end of the rate year to obtain new rates which would reflect the full annual amount of the cost increase. Second-stage filings were designed to avoid this problem. Where a second-stage filing is allowed, the anticipated cost increase is not factored into the original rates, but at a time close to the onset of the cost increase; a second-stage increase in the rates occurs to cover the additional cost. These second-stage filings have been permitted where cost increases are fairly certain to occur during the rate year, easily quantified once they occur and do not reflect any underlying changes in the magnitude or manner of the utility's operations. As a result of these limitations, second-stage filings traditionally covered only employee wage and benefit increases and local ad valorem tax increases. By 1983, these second-stage filings had become a "regular feature", and the PSC began to experiment with the use of third-stage filings effective after the end of the rate year, in an effort to delay the utility's next full-scale rate case *(see, Orange & Rockland Utilities,* [1983] 23 PSC 5874, 5875).

In the case at bar, NYT requested a general rate increase, effective in October 1985, in its November 1984 filing with the PSC (hereinafter the 1985 rate case), seeking not only an initial revenue increase but also an expanded second-stage increase based on a number of specified items. At hearings held on the 1985 rate case, NYT presented evidence concern-

---

1. Drawing from an example provided by the PSC in its brief, if the utility anticipates a cost increase of $10 million per month effective at the beginning of the seventh month of the rate year, the resulting increase in the utility's revenue requirement for the rate year would be $60 million (six months $\times$ $10 million/month). This increased revenue requirement for the rate year would be covered by a $5 million/month increase in the rates for the entire year (12 months $\times$ $5 million/month), but for every month after the end of the rate year, the rates would be $5 million too low to cover the utility's actual costs.

ing its request for a second-stage increase. The PSC's staff and petitioner also presented evidence relative to the second-stage increase. The PSC, in Opinion No. 85-17, limited NYT's second-stage increase to the traditional local taxes and employee wages and benefits, stating with respect to the other items which NYT sought to include in the second-stage increase that "expansion of the second stage as the company requests may be warranted if it permits postponement of a general rate filing" ([1985] 25 PSC 3699, 3879). NYT was invited to submit a proposal for the PSC's consideration, which it did. The PSC sought written and oral comments on this moratorium plan, which proposed a total of four automatic increases during 1986 and 1987, and a number of parties, including petitioner, submitted written comments, with several parties presenting oral statements at a hearing. The PSC ultimately presented a counterproposal, which included many but not all of the items requested by NYT, and also included several items which, according to the PSC, might tend to decrease rates. The rate changes under the PSC's moratorium plan proposal would go into effect in two steps, a second stage in August 1986 and a third stage in August 1987, with formal but expedited evidentiary hearings, and NYT would have to agree unconditionally not to seek a general rate increase until after August 1987. NYT accepted the plan, subject to one revision, and the PSC adopted the plan, as revised, in Opinion No. 85-17A.

Petitioner's objection to the moratorium plan arises out of the denial of its request, during the formal but expedited evidentiary hearings on the second-stage increase, to submit evidence of NYT's revenue growth and declining capital costs that, according to petitioner, should offset the second-stage increase. Distilled to its basics, petitioner's two-pronged argument is that the PSC's determination to grant a second-stage increase[2] is procedurally defective since the denial of petitioner's request to submit relevant evidence violated the "full hearing" requirement of Public Service Law § 92 (2), and that the determination is substantively flawed since, in the absence of evidence concerning revenue growth, capital costs and other relevant factors, there is no rational basis for determining whether the rates resulting from the second-stage increase are fair and reasonable.

2. The third-stage increase is not at issue since the parties entered into a stipulation concerning the implementation of that portion of the moratorium plan.

■ We begin our analysis by holding that the PSC's use of an expanded second-stage increase following "formal but expedited hearings", coupled with a moratorium on a general rate increase, falls within its broad authority to set public utility rates. Setting such rates presents "problems of a highly technical nature, the solutions to which in general have been left by the Legislature to the expertise of the [PSC]" *(Matter of New York State Council of Retail Merchants v Public Serv. Commn.,* 45 NY2d 661, 672). The PSC's authority to establish public utility rates has been recognized as " 'the very broadest of powers' " *(Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 69 NY2d 365, 369). In keeping with this principle, we said in *Matter of New York Tel. Co. v Public Serv. Commn.* (64 AD2d 232, 239, *lv denied* 46 NY2d 710) that: "The [PSC] 'is not bound to entertain or ignore any particular factor in discharging its primary responsibility to determine rates that are just and reasonable' * * * Nor must the [PSC's] determination be 'wholly free from error in the process, or quite in accord with a judicial view of how the procedure before the [PSC] should be managed in detail' * * * 'The scope of judicial review in these matters is, of course, very limited * * * The question before us is whether there is a rational basis for the [PSC's] finding that the rates in question are just and reasonable' ".

In *Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. (supra),* the Court of Appeals held that the authority to order refunds of imprudent charges collected under fuel adjustment clauses may be implied from the PSC's general rate-making powers and from its authority over fuel adjustment allowances under the Public Service Law. While this holding is a narrow one, the court's discussion of the purpose and history of fuel adjustment allowances *(see, supra,* at 369-371) is of broader significance for, in our view, it recognizes that included in the PSC's broad rate-making powers is the authority to fashion reasonable solutions to the problems in prospective rate setting caused by the pressures and demands of a fluctuating economy. The question, then, is not whether the PSC has the authority to fashion such solutions, but whether there is a rational basis for the PSC's finding that the use of a particular solution will result in rates that are just and reasonable.

■ Before resolving this issue, we must first address petitioner's claim that since the second-stage increase exceeded the threshold for "major changes", as defined in Public Ser-

vice Law § 92 (2), the full hearing requirement of that statute was triggered by NYT's second-stage filing and, thus, the PSC could not thereafter exclude evidence of NYT's revenue growth and declining capital costs. We reject the argument for two reasons. First, petitioner's argument would convert every second-stage increase that exceeds the statutory threshold into a general rate case, thereby effectively crippling an accepted regulatory solution to problems inherent in prospective rate setting. The second and more important reason is that petitioner's argument ignores the procedural process which preceded the second-stage filing. It is clear from the record that all parties, including petitioner, had adequate notice and an opportunity to litigate issues relevant to the second-stage increase during the 1985 rate case. NYT's filing with the PSC, which commenced the 1985 rate case, contained a request for an expanded second-stage increase, which included a number of items in addition to the wage and property tax increases traditionally allowed in second-stage increases. The need for a second-stage increase and the items to be included in such an increase were fully litigated during the 1985 rate case, with NYT and other parties, including petitioner, presenting evidence on the issues. In its decision in the 1985 rate case, the PSC granted a second-stage increase but excluded a number of items sought by NYT, concluding that the second stage should not be used to recover post-rate-year costs. In so doing, however, the PSC expressed its belief that expansion of the second stage may be warranted if it permits postponement of a general rate filing, and NYT was invited to submit a proposal for the PSC's consideration. When NYT submitted its proposal, the PSC invited comment and testimony from the parties, which resulted in a number of objections and concerns. In its counterproposal, which formed the basis of the moratorium plan, the PSC addressed many of these objections and concerns. In our view, this procedure fully complied with the hearing requirement of Public Service Law § 92 (2), and the PSC's decision not to permit petitioner to relitigate the need for a second-stage increase did not violate the hearing requirement.

■ Turning to the substantive issue, the record establishes a rational basis and substantial evidentiary support for the PSC's finding that use of the expanded second-stage increase authorized by the moratorium plan would result in rates that are just and reasonable. Petitioner does not claim a lack of evidentiary support for any of the particular items authorized

in the second-stage increase. Rather, its argument is more of a conceptual one, hypothesizing that since the PSC did not treat the second-stage filing as a general rate case in which it would consider all evidence relevant to NYT's revenue requirement for the period covered by the increase, it necessarily follows that the record does not contain substantial evidence to support a finding that the rates resulting from the increase are just and reasonable.

This argument is somewhat blunted by our holding above that the PSC's broad rate-making powers include the authority to use an expanded second-stage increase if there is a rational basis in the record for its use. The PSC is also "free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate" *(Matter of Abrams v Public Serv. Commn.,* 67 NY2d 205, 212). The PSC cannot, however, summarily determine a request for a major change in rates solely on the basis of a review by the PSC and its staff of the utility's filing *(see, Matter of New York Tel. Co. v Public Serv. Commn.,* 59 AD2d 17, 19, *lv denied* 42 NY2d 810). Nor can the PSC redetermine a rate increase where the utility's test period data has become stale to the point of requiring a new hearing on its revenue needs *(see, Matter of Chenango & Unadilla Tel. Corp. v Public Serv. Commn.,* 45 AD2d 409, 414).

Petitioner claims that NYT's revenue growth and declining capital costs establish the need for a new hearing on NYT's revenue requirement for the period following the rate year, when the rates included the second-stage increase. It is apparent, however, that the potential for revenue growth and declining capital costs was factored into the rates authorized as a result of the 1985 rate case. Inherent in the PSC's decision implementing the moratorium plan is its finding that the rates, which were just and reasonable for the rate year, remained so for the relevant period thereafter if the rates were adjusted for certain specific cost increases and decreases which occurred during and after the rate year. In so doing, the PSC elected to ignore not only certain factors which might tend to show a decrease in NYT's revenue requirement, but also other cost increases associated with plant additions, increased expense levels and general inflation, which are typically allowable in general rate cases. The PSC did so for a variety of reasons. Based upon evidence in the record, including that submitted by petitioner, the PSC concluded that the use of an expanded second-stage filing would provide consumers with stable rates that would most likely be substantially

lower than those resulting from another general rate case. The PSC also concluded that the use of a second-stage increase with a moratorium on a general rate increase would provide NYT with the prompt recovery of the cost increases to which it was entitled and, at the same time, free the PSC, its staff and NYT from the burden and inefficiency of the constant cycle of general rate cases. Taking a broader point of view of the rate-making process, the PSC concluded that the moratorium plan would promote utility regulations by incentive, since NYT would bear the risk of many cost increases, but would retain the benefit of increased productivity and sales during the period covered by the moratorium plan. Since these conclusions establish a rational basis for the use of an expanded second-stage filing conditioned upon the postponement of a general rate case, as provided for in the moratorium plan, and since these conclusions are supported by substantial evidence in the record, the PSC's determination must be confirmed. In short, we reject petitioner's procedural and substantive challenges to the moratorium plan.

### NONTRAFFIC SENSITIVE COSTS

Nontraffic sensitive (hereinafter NTS) costs are defined as costs that do not vary with a customer's usage. NYT cites as an example the cost of installing and maintaining the line from a customer's premises to NYT's central office; this cost remains the same irrespective of the customer's volume of usage and thus is not sensitive to traffic. Equipment associated with NTS costs is used in connection with both local and long-distance telephone service. The dispute in this portion of the proceedings arises out of the allocation of these NTS costs between intrastate long-distance charges and other service rates.

As a result of the divestiture of AT&T, intrastate long-distance telephone service has two components: (1) service within a geographically based exchange area, referred to as a local access and transportation area or LATA (New York is divided into six LATAs), and (2) service between LATAs. NYT provides only intra-LATA service, while inter-LATA service is supplied by long-distance carriers, with NYT providing access to the long-distance carriers *(see, Matter of MCI Telecommunications Corp. v Public Serv. Commn.,* 108 AD2d 289, 292). Thus, intrastate long-distance rates include the tolls charged by NYT for intra-LATA service and the charges for linking

customers to the long-distance carriers, referred to as carrier access charges. Interstate long-distance rates are regulated by the Federal Communications Commission (hereinafter FCC) and are not involved in these proceedings.

NYT points out that the inclusion of NTS costs in usage sensitive toll rates leads to an uneconomic price structure, but it had been approved by the PSC in the past since it fostered the policy goal of universally affordable service. As we recognized in *Matter of MCI Telecommunications Corp. v Public Serv. Commn. (supra,* at 292-293), the allocation of NTS costs prior to divestiture had effectively resulted in a subsidy of basic local service through long-distance toll rates. However, technological advances in the telecommunications industry, the advent of competition where none had previously existed, and finally the divestiture of AT&T have combined to require action by governmental agencies, such as the FCC and the PSC, responsible for regulating telephone rates *(see, e.g., supra).* Of particular concern to the PSC was the potential impact of what is referred to as "bypass". Divestiture restricted local exchange companies, such as NYT, to the provision of intra-LATA service, but the long-distance carriers were not prevented from providing service within a LATA. Thus, using new technology, it is feasible for a long-distance carrier to bypass the facilities of NYT and make a direct connection with the customer. NYT, of course, could not collect a carrier access charge where bypass occurred, thereby impacting on its revenue. To avoid the time constraints imposed upon general rate cases by Public Service Law § 92, the PSC instituted a "generic" proceeding to investigate the impact of bypass. This bypass proceeding was divided into two phases: one phase to resolve factual issues, such as the current state of technology, reasons for bypass and future expectations, and a second phase to consider and develop regulatory and legislative options for dealing with bypass.

Bypass was found to occur when the local exchange company's network is technically incapable of providing the service required by the customer or when the cost of providing the service over the bypass system is less than over the local exchange company's facilities. A substantial threat to universal telephone service was found to exist where a cost/price mismatch in the local exchange company's intra-LATA toll rates and carrier access charges caused "uneconomic bypass", which occurs when the cost of the bypass service is lower than the *price* for similar services provided by the local exchange

company, but higher than the local exchange company's *cost* of those services. During the course of the bypass proceeding, there was testimony that the inclusion of NTS costs in access charges and toll rates contributed to uneconomic bypass.

The Administrative Law Judge concluded that while the potential for revenue loss from uneconomic bypass was significant in the absence of "appropriate rate action", the threat was not so imminent that resolution could not await decisions in certain other pending administrative proceedings. The PSC, however, perceived the need for immediate remedial action, stating, "In resolving pending rate matters, we intend to base rates more closely on actual costs, and, to that end, remove the NTS [cost] contribution both from the access charges paid by [long-distance] carriers and from intra-LATA toll rates." Shortly thereafter, the PSC applied this policy in NYT's pending 1985 rate case, reallocating NTS costs from carrier access charges and intra-LATA toll rates to other services. Petitioner raises procedural and substantive objections to the PSC's determinations concerning the reallocation of NTS costs.

■ We first reject petitioner's claim that certain alleged procedural irregularities violated the full hearing requirement of Public Service Law § 92 (2). The 1985 rate case involved "major changes", as defined in Public Service Law § 92 (2), thereby triggering the statute's full hearing requirement, and numerous hearings were held in the 1985 rate case, with oral testimony and documentary evidence introduced on a variety of relevant issues. The reallocation of NTS costs was not one of these issues, however, since it was then being considered in certain generic proceedings, including the bypass proceeding. We have held in a related context that present determinations by the PSC of future policy which may affect rates are not within the statute requiring a hearing in the rate-setting process *(see, Matter of Burstein v Public Serv. Commn.*, 97 AD2d 900, 902), and we conclude that the decision in the bypass proceeding to reallocate NTS costs is such a policy determination. The application of this policy in the 1985 rate case was essentially revenue neutral; it shifted the burden among ratepayers but did not increase NYT's "aggregate revenues", which is the relevant factor for determining whether a major change has occurred under Public Service Law § 92 (2). The statutory full hearing requirement, therefore, was not applicable to the NTS cost reallocation issue.

This conclusion does not, however, render petitioner's proce-

dural arguments irrelevant. The PSC's policy determination remains reviewable for arbitrary and capricious action or abuse of discretion *(see, Matter of Burstein v Public Serv. Commn., supra)*, and its determination to apply the policy in the 1985 rate case to obtain rates that are just and reasonable must have the support of a rational basis in the record *(see, Matter of New York Tel. Co. v Public Serv. Commn.,* 64 AD2d 232, 239, *supra)*. Petitioner's procedural arguments, particularly the claims concerning inadequate notice and lack of an opportunity to present evidence on the NTS cost reallocation issue, are relevant to this review.

The PSC determined, in its discretion, that hearings were necessary to develop a sufficient record to enable it to make factual findings and reach conclusions on matters of policy. If the hearing procedure employed by the PSC failed to give adequate notice of the issues to be considered or failed to afford interested parties an opportunity to present relevant evidence on the issues ultimately determined by the PSC, a question would arise as to whether there had been sufficient development of the record on the relevant issues, which the PSC itself had found necessary. This, in turn, would have a direct impact on the rationality of the PSC's determinations based upon that record, and rationality is the cornerstone of any administrative determination *(see, Matter of Ray v Haveliwala,* 107 AD2d 316, 319).

If the procedural background were as straightforward as that described in the previous discussion of the bypass proceeding, we would have very little difficulty finding that the notice and opportunity to present evidence on the NTS cost reallocation issue in the bypass proceeding was not so inadequate as to impact upon the PSC's determinations concerning reallocation. Unfortunately, the procedural background is nearly as complex as the substantive issues. In addition to the bypass proceeding and the 1985 rate case, there were two other generic proceedings and another rate case in which there was at least the potential for consideration of the NTS cost reallocation issue. The PSC concedes that there was a certain degree of overlapping of issues in these proceedings, but it contends, as does NYT, that viewed in context the various proceedings represented a reasonable and rational procedural approach to the resolution of a highly complex problem, with adequate notice and opportunity to be heard on the NTS cost reallocation issue. Petitioner contends that various orders by the PSC effectively established that rate

restructuring proposals, including NTS cost reallocation, would not be considered in the bypass proceeding since the other generic proceedings were the proper forum for such proposals.

■ Based upon our review of the record, we conclude that, while there may have been some confusion arising out of the various proceedings, there was adequate notice that the bypass proceeding would consider regulatory options for dealing with bypass, including NTS cost reallocation. After extensive testimony in phase I of the generic toll proceeding, initiated in January 1983 to develop, *inter alia,* interstate toll rates and carrier access charges in light of the new industry structure created by divestiture, the Administrative Law Judge's decision contained a finding that inclusion of NTS costs in carrier access charges and toll rates was economically inefficient and encouraged uneconomic bypass, and it was recommended that phase II of the toll proceeding include an examination of the extent of the threat of bypass. The PSC, however, ruled that the bypass issue merited consideration in a separate proceeding and noted that the NTS cost reallocation issue was directly linked to consideration of the severity of the bypass threat.

Shortly thereafter, the PSC initiated the bypass proceeding; specifically included in the issues to be considered therein was "what regulatory approaches" would discourage bypass that is not in the public interest. Despite this notice, petitioner maintains that it was led to believe that all rate structure proposals, including NTS cost reallocation, would be deferred to a third generic proceeding, the rate design proceeding, but we agree with the PSC that, considering the proceedings in context, the record as a whole does not support petitioner's claim. Nor do we find support in the record for petitioner's claim that it or any other party was precluded from presenting evidence in the bypass proceeding concerning the effect and necessity of NTS cost reallocation. Assuming some merit in petitioner's claim that the PSC should be held accountable for having misled petitioner into refraining from presenting proof on the NTS cost reallocation issue in the bypass proceeding, we note that petitioner had the opportunity on its motion for a rehearing to make an offer of proof to show that a further hearing on the issue was necessary. The PSC considered and rejected petitioner's arguments.

The procedure employed by the PSC need not be wholly free from error or quite in accord with the judicial view of appro-

priate procedure *(see, Matter of New York Tel. Co. v Public Serv. Commn.,* 64 AD2d 232, 239, *supra).* We find nothing so irregular in the procedure employed by the PSC herein as to be arbitrary and capricious or to render the determinations irrational.

■ Petitioner also contends that the PSC determination to reallocate NTS costs does not have the necessary evidentiary support in the record. In particular, petitioner argues that the PSC relied exclusively upon a confidential posthearing staff memorandum, but the PSC is permitted to utilize its staff in exercising its independent judgment as to ratemaking *(see, Matter of ADT Co. v Public Serv. Commn.,* 128 AD2d 1, 4), and we find no merit in petitioner's claim that the staff memorandum served as a substitute for evidence that should have been developed in the record. There was substantial testimony in phase I of the toll proceeding concerning the disadvantages of the inclusion of NTS costs in carrier access charges and inter-LATA toll rates, including the impact on bypass, and the PSC was urged to follow the lead of the FCC in removing a substantial portion of NTS costs from long-distance rates. In the bypass proceeding there was testimony and other evidence that the future growth of bypass was likely to be substantial, that bypass posed a serious threat to universal service and that price was a major incentive for bypass. Reduction of the NTS cost burden borne by carrier access charges and inter-LATA toll rates was a remedial pricing measure proposed as a regulatory option for dealing with the bypass threat. Although the immediate reallocation of NTS costs adopted by the PSC apparently was not one of the approaches specifically proposed by the parties, the determination will nevertheless be sustained if there exists in the record a rational basis for the PSC's conclusion *(compare, Matter of Brooklyn Union Gas Co. v Public Serv. Commn.,* 101 AD2d 453, 456, *with, Matter of MCI Telecommunications Corp. v Public Serv. Commn.,* 108 AD2d 289, 297-298, *supra).* We find that the determination has reasonable support from evidence in the record and inferences which could be drawn therefrom by the PSC in the exercise of its broad fact-finding and judgmental powers and, therefore, its resolution of an issue involving highly complex technical problems cannot be disturbed *(see, Matter of New York Tel. Co. v Public Serv. Commn.,* 98 AD2d 535, 538-539). Having found a rational basis for the policy adopted by the PSC in the generic bypass proceeding, we see no reason to disturb the PSC's determination to apply that policy in the 1985 rate case

*(see, Matter of New York State Council of Retail Merchants v Public Serv. Commn.,* 45 NY2d 661, *supra).*

■ Petitioner's final argument is that the reallocation of NTS costs is discriminatory *(see,* Public Service Law § 91 [1], [2], [3]) in that it favors long-distance services. This argument must be rejected, however, since the policy was adopted as a rational response to the significant threat posed by uneconomic bypass *(see, Matter of New York State Council of Retail Merchants v Public Serv. Commn., supra,* at 669). Moreover, as recognized in *Matter of MCI Telecommunications Corp. v Public Serv. Commn. (supra,* at 293), long-distance toll rates had effectively subsidized local service for years.

The PSC's determinations should be confirmed.

MAHONEY, P. J., YESAWICH, JR., and HARVEY, JJ., concur.

Determination confirmed, and petitions dismissed, without costs.