[603 NYS2d 905]

In the Matter of RICHARD M. KESSEL, as Executive Director of the State of New York Consumer Protection Board, et al., Petitioners, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents. (And Another Related Proceeding.) (Proceeding No. 1.)

In the Matter of NEW YORK TELEPHONE COMPANY, Appellant, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent. (Proceeding No. 2.)

Third Department, November 10, 1993

### APPEARANCES OF COUNSEL

*Rafael Epstein,* Albany *(Joel Blau* and *Philip S. Shapiro* of counsel), and *John W. Corwin* and *Keith H. Gordon,* New York City, for Richard M. Kessel, petitioner.

*Robert Abrams, Attorney-General,* New York City *(Keith H. Gordon* of counsel), petitioner *pro se.*

*Gerald Norlander,* Albany *(Jere B. Fletcher* of counsel), for Public Utility Law Project of New York, Inc., petitioner.

*Davis, Polk & Wardwell,* New York City *(Guy M. Struve, Seth R. Lesser* and *David Rosenfeld* of counsel), and *John M. Clarke* and *Thomas J. Farrelly,* New York City, for appellant.

*William J. Cowan,* Albany *(Jonathan D. Feinberg* and *Lawrence G. Malone* of counsel), for Public Service Commission of State of New York, respondent.

### OPINION OF THE COURT

MAHONEY, J.

In November 1984, respondent New York Telephone (here-

inafter NYT) filed a general rate increase request with respondent Public Service Commission (hereinafter the PSC). By way of resolution, the PSC ultimately approved an increase of $226 million (less than 30% of the $775 million originally sought) and adopted a moratorium plan in an effort to prevent successive future rate increase filings (see generally, Matter of Kessel v Public Serv. Commn., 136 AD2d 86, lv denied 72 NY2d 805). Under this plan, procedures were established for reviewing and changing NYT's rates in August 1986 (second stage review) and again in August 1987 (third stage review) in return for NYT's promise not to seek another general rate increase prior to September 1987.

During pendency of this moratorium plan, two significant developments occurred. First, NYT experienced an over-all reduction in its operating expenses due to a decrease in Federal income tax expense as a result of the Tax Reform Act of 1986, a reduction in interest costs and equity returns and a reduction in expenses related to employee pension and death benefits (hereinafter the tax and pension savings). Second, the Federal Communications Commission (hereinafter FCC) announced a January 1, 1990 deadline for the deregulation and detariffing of inside wire in New York.[1] These developments furnished the occasion for the PSC's May 1987 extension of the original moratorium plan. Under this extension agreement, the moratorium on NYT seeking a general rate increase was extended until the end of 1990. As regards the tax and pension savings, a portion thereof was used to decrease NYT's rates by $100 million beginning August 1987; the remainder was assigned to accelerate amortization of the inside wire investment to ensure full amortization prior to the January 1, 1990 detariffing deadline. In the event that the inside wire accounts were fully amortized prior to December 31, 1989, the extension agreement provided that "any excess of tax, pension or return savings will be applied to amortization of the depreciation reserve deficiency pending further action by the [PSC]" (hereinafter Clause Two). The agreement also provided for a limited fourth stage of review in August 1988 and a fifth stage in August 1989 to review "the effects of the moratorium * * * in order to determine the amount of any further reve-

---

1. Inside wire refers to telephone wiring within a customer's premises. Traditionally, it was classified as a utility asset and NYT obtained monthly revenues for it from the customer. Effective January 1, 1990, the FCC announced that inside wire had to be detariffed, i.e., removed from NYT's assets and eliminated as a source of revenue.

nue available, beginning January 1, 1990, for rate reductions or cost offsets" (hereinafter Clause Seven).

NYT fully amortized its inside wire investment by July 1989, six months prior to the January 1, 1990 deadline. Thereafter, in its filing in the August 1989 fifth stage review, NYT requested a rate increase and, claiming a downturn in its earnings, also sought permission to record the tax and pension savings for 1989 and 1990 along with certain other savings as company earnings rather than apply them toward amortization of the depreciation reserve deficiency. In order to expedite matters, the Administrative Law Judge (hereinafter ALJ) bifurcated the fifth stage into two phases. Phase I concerned computation of the dollar amount of the 1989 tax and pension savings remaining after completion of the inside wire amortization and the request for rate relief. Phase II was to entail inquiry into NYT's financial circumstances and the disposition of the 1990 tax and pension savings.

Following completion of the Phase I hearings, NYT proposed a settlement. Objections were made and a hearing was conducted. At that hearing, NYT presented extensive data concerning its deteriorating financial condition. The settlement ultimately was rejected and the PSC proceeded to decide the remaining fifth stage issues without further hearings. Insofar as is relevant here, the PSC refused to permit NYT to retain any of the 1989 tax and pension savings as earnings, concluding that under Clause Two, 1989 savings in excess of that required for the accelerated inside wire amortization were to be used exclusively to benefit the ratepayers by applying them towards reducing the depreciation reserve deficiency. However, the PSC further concluded that the *1990* tax pension savings were not similarly restricted, i.e., that they did not come within the ambit of Clause Two and, accordingly, could, under Clause Seven, be awarded to NYT provided that NYT was experiencing a financial downturn. Finding sufficient evidence of financial downturn, the PSC ultimately permitted NYT to retain the entire $132.4 million 1990 tax and pension savings as earnings along with an additional $20 million in 1990 savings resulting from a change in accounting for ad valorem taxes.

Raising numerous claims of error, petitioners Executive Director of the Consumer Protection Board and the Attorney-General commenced a CPLR article 78 proceeding challenging the determination. Petitioner Public Utility Law Project of New York commenced a separate CPLR article 78 proceeding

seeking similar relief. Inasmuch as substantial evidence questions were raised in both petitions, following joinder of issue Supreme Court transferred both proceedings to this Court pursuant to CPLR 7804 (g). NYT also commenced a related proceeding against the PSC seeking to confirm the $152.4 million actually awarded. The PSC moved to dismiss for lack of standing. Supreme Court agreed and dismissed the petition. NYT appealed. Pursuant to agreement among all parties, the issues raised in all three proceedings will be disposed of in one decision.

Turning first to the merits of the transferred proceedings, the numerous issues presented for review all fall into four broad categories: (1) whether the PSC's interpretation of the extension agreement as permitting it discretion to award the 1990 savings to NYT as earnings relief has a rational basis in the record and, if so, (2) whether the PSC erred in not conducting further hearings before rendering its determination, (3) whether that determination violates the ban on retroactive rate making, and (4) whether it was arbitrary and capricious. For the reasons that follow, we find each of these arguments unpersuasive.

■ Reduced to its essentials, petitioners' arguments relative to the interpretation issue are that the PSC's restriction of Clause Two to only the 1989 tax and pension savings is contrary to the parties' contemporaneously expressed intent, and that its interpretation of Clause Seven as according it discretion to award certain revenues as earnings is violative not only of the parties' intent, but also of the entire premise of regulation by incentive that moratorium plans were designed to achieve. Initially, it is to be noted that resolution of this issue does not involve interpretation of the extension agreement through application of common-law contract principles as certain of petitioners argue, but only whether a rational basis exists to support the PSC's interpretation *(see, Matter of Indeck-Yerkes Energy Servs. v Public Serv. Commn.,* 164 AD2d 618, 621-622; *Matter of New York State Cable Tel. Assn. v New York State Pub. Serv. Commn.,* 125 AD2d 3, 6). In our view, the requisite rational basis exists here.

The clauses at issue provide:

"2. NYT is authorized, beginning January 1, 1987, to use a portion of the [tax and pension savings], to accelerate the amortization of the inside wire portion of Accounts 139 and 232 so that such accounts would be fully amortized on or

before December 31, 1989. If full amortization occurs prior to that date, any excess of tax, pension or return savings will be applied to amortization of the depreciation reserve deficiency pending further action by the [PSC] * * *

"7. In August 1989, the [PSC] will review the effects of the moratorium, as well as the results of the next scheduled depreciation represcription and any major tax or separations changes, in order to determine the amount of any further revenue available, beginning January 1, 1990, for rate reductions or cost offsets."

At first glance, Clause Two does not appear to sweep as broadly as petitioners urge. It speaks only to the disposition of tax and pension savings for the period January 1, 1987 to December 31, 1989; it simply does not purport to direct the disposition of tax and pension revenues received after that date. Nor can the language be said to evidence an obvious intent to forever preclude NYT's retention of any and all tax and pension savings, whenever received, as earnings. While, concededly, certain contemporaneous statements by the parties contained in the record of the extension proceeding do reflect that one of the *goals* was to use the tax and pension savings to benefit ratepayers, a complete reading of the parties' submissions on this subject reveals, quite plainly, that the PSC's interpretation of Clause Two as limited to the 1989 tax and pension savings was in accord with the parties' intent.

Nor can it be said that the PSC's interpretation of Clause Seven as permitting it discretion to review NYT's financial condition and to improve NYT's 1990 earnings through the allocation of 1990 tax and pension savings in the event of financial downturn is irrational. The plain language of Clause Seven permits the PSC to "determine the amount of any further revenue available, beginning January 1, 1990, for rate reductions or cost offsets". Concededly, Clause Seven does not explicitly state that the PSC was empowered to use available revenue to increase NYT's earnings. However, inasmuch as an offset of 1990 costs could indeed result in a concomitant increase in 1990 earnings and Clause Seven preserves the PSC's ability to offset *any* 1990 costs, including those affecting earnings, it seems that necessarily subsumed and preserved within the retained power to offset costs is the power to improve earnings. While it is true, as petitioners contend, that the moratorium scheme did contemplate placement of a certain amount of financial risk on NYT and this purpose is

undermined somewhat by the PSC's intervention in relieving NYT of its financial straits, the agreement also quite clearly contemplated a rate of return for NYT of approximately 12%. Accordingly, petitioners' reliance upon the parties' intent cuts both for and against their position and, as such, is insufficient to demonstrate any irrationality in the PSC's interpretation.

■ Nor are we persuaded that the PSC's failure to hold a further hearing before deciding the disposition of the 1990 tax and pension savings was error. Initially, there is no statutory right to a hearing in this instance. Under Public Service Law § 92 (2), a hearing is required only when there is a change of more than 2.5% in total aggregate revenues. Here, the award of 1990 tax and pension savings to earnings was essentially revenue neutral; it did not increase NYT's aggregate revenues but only specified the manner in which certain revenues were to be treated *(see, Matter of Kessel v Public Serv. Commn.,* 136 AD2d 86, 97, *supra; Matter of Burstein v Public Serv. Commn.,* 97 AD2d 900, 902).* Likewise without merit is the related claim that the ratepayers had a due process right to a hearing because they had a cognizable property right in the 1990 tax and pension savings. It is now well established that while ratepayers are statutorily entitled to just and reasonable rates, they do not acquire any property interest in the utility or its funds *(Matter of GLC Inv. Co. v Public Serv. Commn.,* 136 AD2d 857, 859; *see, Matter of General Motors Corp. v Public Serv. Commn.,* 95 AD2d 876, 877, *lv denied* 60 NY2d 557).* Moreover, as discussed previously, the extension agreement created no such entitlement. That being the case, the conducting of a hearing was subject to the PSC's discretion. In view of the fact that extensive financial information was submitted during the Phase I and settlement hearings conducted in connection with the August 1989 fifth stage review, that adequate notice of the hearings was given, and that petitioners appeared and were given sufficient opportunity to challenge NYT's evidence regarding 1990 earnings, we cannot say that the PSC's failure to conduct additional hearings to further explore NYT's financial situation violated traditional notions of fair play or otherwise was an abuse of discretion.

■ Nor are we persuaded by petitioners' claim that the PSC's determination constituted impermissible retroactive rate making. Simply put, the PSC's allocation of the 1990 tax and pension savings to NYT for earnings relief does not constitute rate making; NYT's rates remained unaffected throughout the term of the extension agreement.

■ As a final matter, we find the PSC's determination that NYT was suffering a financial downturn to be neither arbitrary nor capricious. While, as noted by the ALJ and the PSC itself, the financial data submitted by NYT to support its claim of financial downturn was not of rate case quality, inasmuch as the instant proceedings were not rate increase proceedings, this defect, standing alone, cannot be said to indicate such a lack of development of the record on the relevant issues so as to deprive the determination of a rational basis *(cf., Matter of Kessel v Public Serv. Commn., supra,* at 98). Here, a review of the record reveals extensive financial data on NYT's operating results as projected into 1990. In addition, NYT produced a financial witness who expounded upon the financial data and the utility responded to interrogatories propounded by the ALJ on its financial condition. This evidence established that NYT's rate of return on equity was 10.9% in 1988 and that it was projected to decrease to 7.8% for 1989 and 7.4% for 1990. Not only does this demonstrate a financial downturn, but the projected rates of return are well below the 12% expected under the extension agreement. In our view, this data provides an adequate basis to support the PSC's conclusion of financial downturn. In light of this, the PSC's determination to take steps to preserve NYT's earnings and to provide it with at least a 10% return on equity was in all respects a reasonable exercise of its retained authority. Accordingly, as regards the two transferred proceedings, the PSC's determination must be confirmed and the petitions dismissed.[2]

■ Resolving the issues raised on NYT's appeal is much more straightforward and requires little discussion. Inasmuch as NYT is not seeking any additional revenues in its petition and can, pursuant to the rule laid down in *Parochial Bus Sys. v Board of Educ.* (60 NY2d 539), raise alternate grounds to support the PSC's determination without commencing a separate proceeding *(cf., Matter of Criscione v City of Albany Bd. of Zoning Appeals,* 185 AD2d 420), it has failed to demonstrate the requisite injury in fact to challenge the PSC's determination *(see, e.g., Society of Plastics Indus. v County of Suffolk,* 77

2. While petitioner Public Utility Law Project of New York has moved to have this Court consider or take judicial notice of a 1993 report prepared by the PSC's staff, inasmuch as this report was prepared well after the PSC issued the determinations challenged in this proceeding, it has no relevance in resolving the issues raised. Accordingly, we have not considered the document and conclude that the motion should in all respects be denied.

NY2d 761, 772-773; *Matter of Oil Heat Inst. v Public Serv. Commn.*, 90 AD2d 942).

MIKOLL, J. P., YESAWICH JR., MERCURE and CREW III, JJ., concur.

Adjudged that the determinations are confirmed, without costs, and petitions dismissed.

Ordered that the judgment is affirmed, without costs.